**Ralph Earl ROORDA, Plaintiff,**

v.

**VOLKSWAGENWERK, A. G., a/k/a Volkswagenwerk Aktiengesellschaft, a corporation, Defendant.**

Civ. A. No. 76–2237.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 20, 1979.

Ellis I. Kahn, Charleston, S. C., James H. Toms, Hendersonville, N. C., Herbert Resner, San Francisco, Cal. for plaintiff.

Joseph R. Young, Charleston, S. C., for defendant.

## ORDER

BLATT, District Judge.

Ralph Earl Roorda, the plaintiff herein, is a paraplegic, paralyzed from the waist down, and without sight in one eye. He alleges that these injuries were caused by a defective Volkswagen automobile which had been manufactured by defendant, Volkswagenwerk, A.G.,—(hereinafter referred to as VWAG)—in West Germany. The vehicle was sold by VWAG to a dealer in West Germany, who then sold it to a purchaser there. Several transactions later, plaintiff purchased this automobile in Arizona, and while driving it in California in 1970 it overturned, and plaintiff was critically injured. Immediately prior to the institution of this suit, plaintiff changed his domicile from California to South Carolina, and he instituted suit here on November 26, 1976, alleging negligence, breach of warranty, and strict liability in tort. Plaintiff has remained to this date a citizen of South Carolina, residing in Charleston County. Defendant VWAG questions the jurisdiction of this court to hear the merits of this controversy.

The issue confronting this court is whether VWAG was "present" in South Carolina for jurisdictional purposes, when suit was instituted, i. e., whether VWAG's contacts with South Carolina were sufficient to make it amenable to suit in this state and not offend traditional notions of fair play and substantial justice within the meaning of *International Shoe Company v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

VWAG is a corporation organized and existing under the laws of the Federal Republic of Germany. It manufactures Volkswagen automobiles and parts and accessories for such automobiles. Volkswagen of America—(hereinafter referred to as VWOA)—is a New Jersey corporation and is the sole "importer" of Volkswagen products in the United States. Neither VWAG nor VWOA is "registered" to do business in South Carolina within the meaning of Sections 15-9-240 and 33-23-10, S.C.Code 1976.

Initially, plaintiff brought suit against VWAG, VWGMBH—(a predecessor of VWAG)—and VWOA. Plaintiff has agreed that he has no cause of action against the

latter two entities and they have been dismissed. Service of process was accomplished on VWAG by service on the Secretary of State of South Carolina pursuant to Section 15–9–240, S.C.Code 1976, and such service was completed by forwarding a copy of the process by registered mail to Toni Schmucker, Chairman of the Board of Management of VWAG, in Wolfsburg, West Germany. Additionally, service of process was made under the same statute on VWOA as agent for defendant, VWAG, and a copy thereof sent by registered mail to VWOA in New Jersey, where VWOA is domiciled.

VWAG does not contest the fact that service was made on it and on VWOA in accordance with the method provided by Section 15–9–240, S.C.Code 1976; VWAG urges, however, that such service is not sufficient to confer jurisdiction upon the court in South Carolina because it transacts no business here. Furthermore, VWAG urges that while its wholly owned subsidiary, VWOA, may be subject to jurisdiction of the South Carolina courts, that fact does not give the courts here jurisdiction over VWAG as plaintiff admittedly has not attempted to pierce the corporate veil of the two corporations so as to make them one and the same and to hold VWAG here under the "alter ego" theory. (*Cf., Dewitt Truck Brokers, Inc. v. W. Ray Fleming Fruit Company*, 540 F.2d 681 (4 Cir. 1976)). Plaintiff, on the other hand, contends that the absolute control exercised by VWAG over VWOA mandates a finding that VWOA is the "agent" in South Carolina for VWAG, that VWAG was "present" and "doing business" in South Carolina, and that the service on VWAG directly and on VWOA as its agent in South Carolina has brought VWAG into the jurisdiction of this South Carolina federal court.

■ This court has received able briefs from counsel, and has heard extensive arguments on the jurisdictional question here involved, and discovery material addressed to this issue has been reviewed. Before deciding the jurisdictional issue raised by the defendant, VWAG, this court must view the entire record to determine the quantity and quality of the contacts which VWAG has had with South Carolina, the forum state. To sustain jurisdiction, plaintiff relies on the relationship between VWAG and VWOA. It is admitted that VWOA, though not "registered" in South Carolina, is present in this state for jurisdictional purposes. A good example of the reason for VWOA's admitted presence in South Carolina is the fact that in the years 1974–76 it had sales here as hereinafter listed:

| 1974 — | $21,512,926.00 |
| 1975 — | $14,710,414.00 |
| 1976 — | $ 8,340,730.00 |

There are thirteen franchised VW dealerships in South Carolina, said dealers being licensed by VWOA, and VWOA's representatives frequently visit the state transacting business and servicing these dealerships, and, thus, indirectly servicing consumers as well. VWOA's advertising permeates the media in South Carolina; there are other indicia of its admitted "presence" for jurisdictional purposes as well.

Although VWAG contends that it is not "present" in South Carolina for jurisdictional purposes, the record and the reasonable inferences to be drawn therefrom clearly prove the contrary. VWAG is "present" in South Carolina, in this court's opinion, in the intimate and complete control which it exercises over VWOA, so as to make VWOA its South Carolina agent, and, thereby, VWAG may be required to defend this suit in South Carolina without offending the "fair play and substantial justice" rule of *International Shoe, supra.* As sole importer of VW products, VWOA is subject to many direct and indirect controls from VWAG. This corporation is wholly owned by VWAG; its Board of Directors holds practically all of its meetings in Wolfsburg, West Germany, the situs of the corporate headquarters of VWAG; many of the board members of VWOA are on the board of VWAG. Under the agreement between VWAG and VWOA, which agreement is a part of the record herein, VWOA appoints dealerships at locations which must have the approval of VWAG, and VWOA must

communicate to all dealers the directives and suggestions made by VWAG. In this manner, VWOA is agent for VWAG to communicate with South Carolina dealers and consumers. Additionally, VWOA must comply with VWAG procedures for ordering and shipping VWAG's products; VWOA must use forms prescribed by VWAG; orders can be rejected only by VWAG and VWOA cannot sue VWAG for delay in delivery; VWAG is not required to observe set installment for delivery of VWOA's orders. Such facts reveal VWAG's complete control over VWOA and control is a fundamental element of agency. *Burriss v. Texaco, Inc.*, 361 F.2d 169, 172 (4 Cir. 1965). VWAG substantially directs the daily business of VWOA; the very place of business of VWOA must be "located, installed and equipped in a manner reasonably satisfactory" to VWAG; VWOA can only use stationery and business forms printed in accordance with VWAG's specifications; the trademark "VW", and the word "Volkswagen", can only be used from matrices supplied by VWAG; the number of VWOA's office employees and field men for servicing dealers are subject to VWAG's approval, and these VWOA field men have been engaged in systematic contacts with South Carolina in a substantial sense over a period of many years. VWAG has the right to inspect VWOA's records and accounts, including the right to have VWOA's report on market conditions, sales performance, inventories and estimates of requirements. VWOA and VWAG have the same counsel in this case as the affidavits of record reveal. VWOA must submit its yearly and interim financial statements to VWAG. The contract between the parties even provides that delays by VWOA in fulfilling its obligations will compel a penalty payment to VWAG of 1,000 Deutsch Marks per day. Germany is the place of performance of the contract, indicating again VWAG's pervasive role in the relationship between VWOA and VWAG. In fact, VWOA is admittedly the service agent designated by VWAG pursuant to Section 110(e) of the National Traffic and Motor Vehicles Safety Act. (*See, also, Bollard v. Volkswagenwerke A. G.*, 313 F.Supp. 126 (W.D.Mo.1970).

The above discussion convinces this court that there is a sufficient evidentiary basis in this record to support the assertion of jurisdiction over VWAG based on the intimate relationship between VWAG and VWOA and the contacts with this jurisdiction by VWOA. The control VWAG exercises over VWOA is so complete that to find VWOA "present" in South Carolina for jurisdictional purposes—(a finding which the defendant does not contest)—it is necessary to find that VWAG has the same status. Such a conclusion is mandated for the reasons so ably and logically expressed by Judge Robert W. Hemphill, now Chief United States District Judge for the District of South Carolina, in *Szantay v. Beech Aircraft Corp.*, 237 F.Supp. 393 (E.D.S.C.1965). Judge Hemphill reviewed in great detail the relationship found there between the manufacturer, Beech, and its distributor, Hawthorne, and held that such relationship was sufficient to confer jurisdiction over the manufacturer. The court determined that defendant, Beech, a Delaware corporation with its principal place of business in Wichita, Kansas, was present in South Carolina for all purposes because of its relationship with Hawthorne, a South Carolina corporation, despite its assertion that it was not registered in South Carolina, and that it had no agent and did not engage in business activities within this state. To reach this result, Judge Hemphill relied on the contractual relationship, the course of conduct, the control, and the resulting "involvement" between Beech and Hawthorne. *Id.* at 394. Adopting what a later court called "a 'general agency' theory of 'presence' "—(*Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 423 (9 Cir. 1977))—Judge Hemphill held that Beech, through its control of Hawthorne, had such substantial contact with South Carolina that finding Beech amenable to service of process in South Carolina did not offend "traditional notions of fair play and substantial justice." Recognizing, as Judge Craven later stated in *Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745, 747 (4 Cir.

1971), that "South Carolina has extended its service of process laws to the outer limits allowed by *International Shoe*," Judge Hemphill disregarded Beech's contentions that it was not registered to do business in South Carolina and that service on Hawthorne, as Beech's agent, did not give the South Carolina court jurisdiction of Beech.[1] Judge Hemphill stated at page 399 of 237 F.Supp.:

". . . It can only be concluded that South Carolina never intended that a foreign corporation with sufficient 'nexus' with the State, which refused or failed to comply with the statutory requirements of the State, could not be sued under the same circumstances where a foreign corporation which did comply with the State law was subject to suit. . . . Further, the Congress has specifically enunciated the policy this Court shall follow, by indicating that a Federal District Court, in diversity cases, shall be available wherever the foreign corporation is doing business. 28 U.S.C. § 1391(c). Plainly, this indication of the Congressional will was designed to remove any possible advantage a foreign corporation might acquire by failing to observe the requirements of State law, as was done here. *L'Heureux v. Central American Airways Flying Service, Inc.*, 209 F.Supp. 713, 715 (D.Md. 1962).

In *Foster v. Morrison*, [226 S.C. 149, 84 S.E.2d 344] *supra*, upon which defendant Beech relies most heavily, the foreign corporation objecting to the service of process had once complied with the statutes, but had left the State, severed connections, before the institution of suit. The facts in the instant case show that Beech was 'present' and 'doing business' within the State during all times material. [Of course, 'presence' and 'doing business' are not the only factors. *See Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A.*, 232 F.Supp. 433, 435 (S.D.N.Y.1964).]

Therefore, when a foreign corporation maintains its 'presence' in the State jurisdiction, at least up to the time of the institution of suit, without complying with the statutory requirements, it is subject to the same suits and service of process as are domestic corporations and other foreign corporations who have complied with the statutory requirements. This is particularly so when the maintenance of suit will not do violence to the concept of 'fundamental fairness' which has evolved through the cases." (footnote omitted).

Furthermore, in reviewing the relationship between Hawthorne and Beech, Judge Hemphill quoted with approval from cases from the Fourth and Fifth Circuit Courts of Appeal:

"As Judge Brown observed in *Delray Beach Aviation Corp. v. Mooney Aircraft, Inc.*, 332 F.2d 135 (5th Cir. 1964):

'Mooney Aircraft, engaged in the manufacture of airplanes in Texas, but aware that its commercial success depended on the intensive sale of its airplanes throughout the nation, purposefully sought to enter and compete in the Florida market. With a choice of doing it by direct employees in a company branch, or through a traditional sales and service distributor, it deliberately chose the latter. * * * Through this medium it was doing substantially everything which a branch could have done. Florida, as a matter of deliberate policy * * * sees no distinction between the two. Nor through constitutional eyes, must there be any distinction where in fact the contacts are sufficient, as they are here. * * *'

332 F.2d at 141.

'The inescapable fact which courts ought to be able to recognize is that Mooney Aircraft and Metropolitan had,

---

1. In *Ratliff, supra*, as in *Szantay, supra*, the court gave little weight to the "registration-to-do-business" factor.

"We think the application to do business and the appointment of an agent for service to fulfill a state law requirement is of no special weight in the present context." *Ratliff*, at 748.

to a great extent, a mutual interest in the sale, service, and distribution of Mooney airplanes. Paraphrasing a celebrated apothegm, what was good for Metropolitan was good for Mooney Aircraft, and vice versa.

\* \* \* \* \* \*

'It would be difficult to conceive of a relationship imposing a greater duty, either legal or moral, on the part of Metropolitan to forward a court summons to Mooney Aircraft. The claim arose out of the failure of a Mooney airplane in flight. The business reputation, prestige and future sales of both Mooney Aircraft and its distributor, Metropolitan, made it important that this litigation be properly handled. With so much at stake for each in the future sales of Mooney airplanes in that wide area, there was every reason to suppose that Metropolitan would do exactly as it did—transmit the process immediately. Within the broad qualitative-quantitative standards imposed by the distributor sales and service agreements, Metropolitan would be aware that failure to give notice to Mooney Aircraft in time for it reasonably to protect its interests would subject the distributor to the likely cancellation of the contract and the termination of what must have been deemed to be a profitable business connection. As we said in *Acme Eng'r, Inc.* [*Acme Eng'r, Inc. v. Foster Eng'r Co.*, 5 Cir., 254 F.2d 259], of a Texas "traveling salesman," Metropolitan here "occupies such a responsible representative status as to make it reasonably certain that [it] will turn over the process to his company." And there, as here, the fact that the representative "actually passed [the process] on" may be considered in determining that reasonable probability. 254 F.2d 259, 263. It is this strong compulsion, whether described as a moral or a legal duty, to transmit the process on to the nonresident which supplies what was held to be the missing compunction in *Wuchter v. Pizzutti*, 1928, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446.'

332 F.2d at 1430.

This case from the Fifth Circuit Court of Appeals and the instant matter under consideration are strikingly similar factually, and the comments there seem equally apropos here.

In *Kahn v. Maico Co.*, 216 F.2d 233 (4th Cir. 1954) another substantially similar set of facts arose in Maryland. A domesticated partnership had an exclusive franchise from a foreign manufacturer who had not 'qualified' within the State. The contract contained restrictions and controls on the local distributor much like those present here. Like Hawthorne, the local distributor bought the foreign corporation's products at a discount; received no sales commission. In confirming jurisdiction, Chief Judge Parker said:

'[T]here can be no doubt but that defendant actually participated in the sales made by plaintiffs, since the guaranty given in connection with the sale of a hearing aid was a part of the sale, and in making the guaranty the plaintiffs were unquestionably acting as agents of defendants.

\* \* \* \* \* \*

'On these facts, we think that defendant was clearly doing business in the state within the meaning of the statute. In *La Porte Heinekamp Motor Co. v. Ford Motor Co.*, D.C., 24 F.2d 861, and the very recent case of *Thomas v. Hudson Sales Corp.*, [204 Md. 450] 105 A.2d 225, 228, in both of which jurisdiction was sustained, it was pointed out that, while it did not constitute doing business within the state for a foreign corporation to make sales outside the state to distributors who carried on business therein, even though a district superintendent might visit them and advise with respect to selling policies, nevertheless such foreign corporation would be held to be doing business within the state if it went beyond this pattern and exercised substantial control over the business of

the local distributor. Here the defendant not only controlled the business policies of the distributor, but also regulated the details of the business almost as completely as if the distributor had been an agent in all respects. No one would contend that what was done did not constitute doing business by defendant if plaintiffs had been compensated on a commission basis instead of by discounts allowed from the sale price which defendant fixed; but the method of compensating the one who carries on the business cannot defeat jurisdiction when it appears that it was in reality defendant's business that was being carried on.'

216 F.2d at 235."

The Fourth Circuit Court of Appeals granted Beech an interlocutory appeal and affirmed Judge Hemphill's opinion on the jurisdictional questions:

"[1] Beech is incorporated under the laws of Delaware and has its principal place of business in Kansas. The District Judge found that Beech had sufficient contacts with South Carolina through its local dealer to permit service on it under South Carolina law pursuant to Rule 4(d)(7), Fed.R.Civ.P. The evidence amply justifies the finding.

■ Service of process was undertaken pursuant to Section 10–423, Code of Laws of South Carolina (1962), which provides that effective service may be obtained on a foreign corporation by serving ' * * * any * * * agent thereof' in South Carolina. We affirm the District Court's holding, 237 F.Supp. 393, that the extensive control and supervision exercised by Beech over its dealer, by reason of which Beech is deemed to have had sufficient contacts with South Carolina, is sufficient to constitute that dealer the agent of Beech for service of process." 349 F.2d 60 at p. 62.[2]

Many of the terms in the Beech-Hawthorne contract, set forth in *Szantay*, are almost identical to those in the VWOA–VWAG contract. Hawthorne was required to give monthly inventory reports to Beech; Hawthorne could only use signs which Beech provided; when the distributorship agreement terminated, Hawthorne could no longer use the "Beechcraft" name; there was a marked inter-relation of advertising; Beech furnished the forms for Hawthorne to use in accounting; Beech had the right to inspect Hawthorne's facilities, supplies and personnel; Hawthorne was required to use Beech parts unless Beech gave express permission otherwise; Hawthorne used forms furnished by Beech in ordering airplanes; Hawthorne's warranties were closely regulated by Beech; Hawthorne was required to comply with policies, directives and requirements contained in the Beechcraft Sales Policy Manual; and Hawthorne appointed dealers for the sale of the airplanes at such places as Beech approved.

Many courts in cases involving factual situations almost identical to *Szantay*, in several of which cases Beech was a defendant under similar contracts with local distributors, have followed the reasoning of Judge Hemphill and the approval given his opinion by the Fourth Circuit Court of Appeals. *Wells Fargo & Co. v. Wells Fargo Express Co., supra; Griffin v. Air South, Inc.*, 324 F.Supp. 1284 (N.D.Ga.1971); *ACS Industries, Inc. v. Keller Industries, Inc.*, 296 F.Supp. 1160, 1163 (D.Conn.1969); *Volkswagen Interamericana, SA v. Rohlsen*, 360 F.2d 437 (1st Cir. 1966); *Siegling v. International Association of Approved Basketball Officials, Inc.*, 262 F.Supp. 441 (D.S. C.1966); *Bramlett v. Arthur Murray, Inc.*, 250 F.Supp. 1011 (D.S.C.1966); *Hughes v. Kaiser Jeep Corp.*, 246 F.Supp. 557 (D.S.C. 1965); and *Dunn v. Beech Aircraft Corp.*, 276 F.Supp. 91 (E.D.Pa.1967). One of these courts even discussed the "Beech trilogy" and pointed out the unusual control exer-

---

**2.** While it is true that service in *Szantay* was effected under then Sections 10–421 and 423 of the 1962 Code of Laws of South Carolina— (now Sections 15–9–210 and 15–9–230)—and service in the instant case was effected under what formerly was Section 10–424 of the 1962 Code of Laws of South Carolina—(now Section 15–9–240)—the jurisdictional question in both instances involves the principle of the corporate defendant's "presence" in South Carolina.

cised by Beech in its relationship with its distributors:

". . . Beech's relationship with its distributor was shown by analysis of their intercorporate contracts and memoranda, and by depositions. Its agreement provided that the distributor's staff and service must be *acceptable to Beech*, inventory would be *prescribed by Beech*, parts would be *supplied by Beech*, and facilities would be provided as *deemed necessary by Beech*. Beech provided pricing guidelines, established minimum quotas, supplied all advertising, limited territory, regulated accounting procedures and controlled warranties, servicing and other aspects of sales. The distributor was pledged to do whatever 'Beech may consider essential to the development of [its] territory.' *Szantay, supra*, at 399–400." [emphasis in original]. *ACS Industries, Inc. v. Keller Industries, Inc., supra*, at p. 1163.

VWAG relies heavily on the case of *Cannon Manufacturing Company v. Cudahy Packing Company*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), a case in which Cannon, a North Carolina corporation, brought suit in that state against Cadahy, a Maine corporation, with a wholly owned subsidiary corporation that had been incorporated in Alabama, and which subsidiary maintained an office in North Carolina. The Alabama subsidiary was used to market Cudahy's products in North Carolina.[3] Goods sold by the subsidiary were sent directly by the parent to the buyer in North Carolina; however, the subsidiary collected the purchase price. The relationship between the two corporations was noted in detail:

". . . The Alabama corporation, which has an office in North Carolina, is the instrumentality employed to market Cudahy products within the State; but it does not do so as defendant's agent. It buys from the defendant and sells to dealers. In fulfillment of such contracts to sell, goods packed by the defendant in Iowa are shipped direct to dealers; and from them the Alabama corporation collects the purchase price. Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other States. The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general Cudahy business was doubtless adopted solely to secure to the defendant some advantages under the local laws. . . ." at 335, 45 S.Ct. at 250–251.

The Supreme Court held that regardless of the identity of interest and high degree of control which the parent exercised, the formal separation was sufficiently real to resist jurisdiction of the parent. In this connection, the Supreme Court stated at pages 336–338, 45 S.Ct. at pages 251–252:

"The defendant wanted to have business transactions with persons resident in North Carolina, but for reasons satisfactory to itself did not choose to enter the State in its corporate capacity. It might have conducted such business through an independent agency without subjecting itself to the jurisdiction. *Bank of America v. Whitney Central National Bank*, 261 U.S. 171 [43 S.Ct. 311, 67 L.Ed. 594]. It preferred to employ a subsidiary corporation. Congress has not provided that a corporation of one State shall be amenable to suit in the federal court for another

---

3. No contention was made that the cause of action involved any activity by the parent in North Carolina.

State in which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein. Compare *Lumiere v. Mae Edna Wilder, Inc.*, 261 U.S. 174, 177, 178 [43 S.Ct. 312, 67 L.Ed. 596]. That such use of a subsidiary does not necessarily subject the parent corporation to the jurisdiction was settled by *Conley v. Mathieson Alkali Works*, 190 U.S. 406, 409–411 [23 S.Ct. 728, 47 L.Ed. 1113]; *Peterson v. Chicago, Rock Island & Pacific Ry. Co.*, 205 U.S. 364 [27 S.Ct. 513, 51 L.Ed. 841]; and *People's Tobacco Co., Ltd. v. American Tobacco Co.*, 246 U.S. 79, 87 [38 S.Ct. 233, 62 L.Ed. 587, Ann. Cas.1918C, 537]. In the case at bar, the identity of interest may have been more complete and the exercise of control over the subsidiary more intimate than in the three cases cited, but that fact has, in the absence of an applicable statute, no legal significance. The corporate separation, though perhaps merely formal, was real. It was not pure fiction. There is here no attempt to hold the defendant liable for an act or omission of its subsidiary or to enforce as against the latter a liability of the defendant. Hence, cases concerning substantive rights, like *Hart Steel Company v. Railroad Supply Co.*, 244 U.S. 294 [37 S.Ct. 506, 61 L.Ed. 1148]; *Chicago, etc. Ry. Co. v. Minneapolis Civic Association*, 247 U.S. 490 [38 S.Ct. 553, 62 L.Ed. 1229]; *Gulf Oil Corp. v. Lewellyn*, 248 U.S. 71 [39 S.Ct. 35, 63 L.Ed. 133], and *United States v. Lehigh Valley R.R. Co.*, 254 U.S. 255 [41 S.Ct. 104, 65 L.Ed. 253], have no application.

The plaintiff contends, on a further ground, that the defendant was present in North Carolina. The argument is that there is no such thing as a corporation sole under the laws of Alabama; that three stockholders are necessary in order to sustain the existence of a corporate entity; that where the number of members falls below three the entity falls into a state of suspense; that the defendant, in fact, owned all the stock in the Ala-

bama corporation; that the directors of the latter could not have been *bona fide* directors because not stockholders; that its franchise was suspended, (*First National Bank of Gadsden v. Winchester*, 119 Ala. 168 [24 So. 351, 72 Am.St.Rep. 904]); and that therefore what was done in North Carolina must have been done by the defendant. No Alabama case has been cited, or found, which determines the effect, in that State, of such alleged suspense. Nor has any case been cited, or found, which determines what would be its effect under the law of North Carolina. It is not contended that the Alabama corporation was dissolved *ipso facto* by this concentration of its stock, or that its property became, in law, that of the defendant. It may be that upon the concentration of its stock in the hands of the defendant, the franchise of the Alabama corporation became subject to forfeiture in a judicial proceeding by the State; or that thereby its status was reduced from a corporation *de jure* to one *de facto*. But whatever might be other legal consequences of the concentration, we cannot say that for purposes of jurisdiction, the business of the Alabama corporation in North Carolina became the business of the defendant."

This court has reviewed literally hundreds of cases in which the *Cudahy* holding, and its present effect on jurisdictional questions, is discussed. It appears to this court that the great majority of the courts which have been involved with a parent-subsidiary issue in which jurisdiction is sought over the parent, have not overruled *Cudahy*, but have found means to avoid the stringent *Cudahy* principle in all instances when the parent completely dominates the activities of the subsidiary, as the facts in the instant case so clearly indicate.[4] While it would be far too burdensome to this court, and to any court which might be hereafter required to scrutinize this Order, to review in detail the many, many cases which have discussed the present-day effect of *Cudahy*, there are a

---

4. For a "treatise" on the demise of *Cudahy*, see *Energy Reserves Group, Inc. v. Superior Oil Company*, 460 F.Supp. 483, 495–511 (D.C.Kan. 1978).

few cases in which a similar issue as here has been involved that this court feels merit discussion. In *Hitt v. Nissan Motor Co., Ltd.*, 399 F.Supp. 838 (S.D.Fla.1975), which case concerned a Japanese automobile manufacturer and its American subsidiary, Judge Atkins stated, at page 849 of 399 F.Supp.:

"*Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), is a watershed case widely cited for the proposition that mere ownership of a subsidiary without more will not subject the foreign parent to the jurisdiction of the state where the subsidiary is doing business. In *Cannon*, the parent corporation dominated its subsidiary through complete stock ownership but formal corporate separateness was carefully maintained in all respects. However, *Cannon* is distinguishable from the case *sub judice* in that Cannon involved no question of the constitutional powers of the state or of the federal government but it was merely the Supreme Court's interpretation of what activities constituted 'doing business' within a forum and thus involved the concept of 'presence' and not the less rigid 'minimum contacts' test of *International Shoe*. The three cases cited by defendant, *Berkman v. Ann Lewis Shops*, 246 F.2d 44 (2nd Cir. 1957); *A. C. S. Industries v. Keller Industries, Inc.*, 296 F.Supp. 1160 (D.Conn.1969); *Scalise v. Beech Aircraft Corp.*, 276 F.Supp. 58 (E.D.Pa.1967), do support the contention that *Cannon* is still good law but in *Berkman* and *A. C. S.* the long-arm statutes were held inapplicable while *Scalise* like *Cannon* involved the stringent 'doing business' test.[21]

[21] For contrary results involving long-arm statutes extending as far as due process allows see *Bland v. Kentucky Fried Chicken*, 338 F.Supp. 871 (S.D.Tex.1971) and *Taisho Fire & Marine v. Vessel Montana*, 335 F.Supp. 1238 (N.D.Cal.1971), *Duplan Corp. v. Deering Milliken, Inc.*, 334 F.Supp. 703 (D.S.C.1971)."

In another case involving an attempt to acquire jurisdiction in the State of Michigan over a foreign automobile manufacturer, in discussing the present-day effect of

*Cudahy*, the Court of Appeals for the Sixth Circuit said in *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292 (1964), at page 296:

"[4] Considering first the chain of corporate ownership, Regie owns 100% of the stock of Renault, and Renault in turn owns 100% of the stock of Great Lakes, which, as indicated, carries on substantial economic activities within the State of Michigan. However, the mere ownership by a corporation of all of the stock of a subsidiary amenable to the jurisdiction of the courts of a state may not *alone* be sufficient to justify holding the parent corporation likewise amenable.[13] In the early case of *Cannon Mfg. Co. v. Cudahy Packing Co.*,[14] the Supreme Court held that the activities of a subsidiary did not subject its parent corporation to the personal jurisdiction of local courts.

It should be noted that the ruling of the *Cannon* case, if not qualified by the subsequent ruling in the *International Shoe Company* case, has been at least qualified in later cases holding foreign corporations amenable to the personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious,[15] or that the parent has held the subsidiary out as its agent,[16] *or, more vaguely, that the parent has exercised an undue degree of control over the subsidiary.*[17] " (emphasis added) (footnotes omitted)

In *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519 (S.D.N.Y. 1975), the court there, reviewing the New York law, which state, like South Carolina, "has extended its service of process laws to the outer limits allowed by *International Shoe*," stated at page 521 of 398 F.Supp.:

"New York courts have held that a parent corporation can be present in the state because of the activities of its subsidiary. However, the activities must amount to more than the mere parent-subsidiary relationship, *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Simon-*

*son v. International Bank*, 16 A.D.2d 55, 225 N.Y.S.2d 392, aff'd 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1962). The parent may be subject to jurisdiction where the subsidiary 'performs all the business' which the parent could do 'were it here by its own officials.' *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851, 854 (1967); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116 (2nd Cir. 1967). Additionally, where the subsidiary is 'in fact, if not in name' a branch of the parent, the distinctions between the two fall and the parent is amenable to New York's jurisdiction. *Public Administrator of County of New York v. Royal Bank of Canada*, 19 N.Y.2d 127, 132, 278 N.Y.S.2d 378, 382, 224 N.E.2d 877 (1967); *Taca International Airlines S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965)."

*Fisher v. First National Bank of Omaha*, 338 F.Supp. 525 (S.D.Iowa 1972) reviewed the minimal contacts necessary for jurisdiction in Iowa and, in discussing *Cudahy*, stated at page 529 of 338 F.Supp.:

"A corporation is not doing business in a state merely by the presence of its wholly owned subsidiary. *Cannon Manufacturing Co. v. Cudahy Packing Co.* (1925), 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634. However, the fiction of corporate entity may be disregarded, where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation. Even a non-owned corporation may act as agent for another corporation. No all embracing rule has been laid down under which the relationship between two corporations may be determined. The circumstances in each case must be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its long arm statute."

*W. Clay Jackson Enterprises v. Greyhound Corp.*, 431 F.Supp. 1229 (D.Puerto Rico 1977) contains the following footnote 1. which is pertinent to the question under consideration here:

"1. Defendants rely on *Cannon Mfg. Co. v. Cudahy Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) as supportive of the view that jurisdiction is not to be asserted over a nonresident parent corporation, no matter the extent of control. We cannot agree with this construction. Not only was *Cannon* decided long before the Supreme Court announced its landmark decision in *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), but in *Cannon*, no question of the constitutional powers of the State was presented. The claim that jurisdiction existed was 'not rested upon the provisions of any state statute or upon any local practice dealing with the subject.' *Cannon Mfg. Co. v. Cudahy, supra*, 267 U.S. at 336, 45 S.Ct. at 251. Such is clearly not the case here. Moreover, the inapplicability of *Cannon* under exceptional circumstances, similar to those present in this case, has been recognized by a myriad of subsequent court decisions, some of which are cited in the text of this opinion." at page 1232.

The court in *Stoehr v. American Honda Motor Company, Inc.*, 429 F.Supp. 763 (D.Neb.1977), a case involving an attempt to acquire jurisdiction over a foreign motorcycle manufacturer, briefly, but wisely, described the jurisdictional restrictions of *Cudahy*:

"The question is essentially a factual one. A parent-subsidiary relationship by itself is not sufficient to justify service in this manner. *Cannon Mfg. v. Cudahy Packing, supra*. Nor is a manufacturer-distributor arrangement sufficient. *Turner v. Jack Tar Grand Bahama, Ltd.*, 353 F.2d 954 (5th Cir. 1965).

But where the parent company has complete control over the subsidiary, *conducting its business and controlling its policies* . . . [or where the subsidiary] is a mere adjunct and instrumentality of the parent . . . [or] if a subsidiary corporation is mere-

ly a "dummy" by means of which the parent corporation does business in the state, service on the subsidiary may bind parent. *Fletcher Cyclopedia of Corporations*, Section 8773 at pp. 527–528. (Citations omitted.)" (emphasis added).

Finally, in holding another foreign parent "present" because of activities of its New York subsidiary under facts quite like those found in the instant case, in *Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa*, 428 F.Supp. 1237 (S.D. N.Y.1977), that court wrote at page 1242:

"Here the existence of the parent-subsidiary relationship between Societa and Snia Viscosa, Inc. ("Snia") necessitates a close factual scrutiny of the nature of Snia's business and of its connections with Societa. Although the parent-subsidiary relationship is not *per se* sufficient to establish personal jurisdiction over the foreign parent, *Cannon Mfg. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Simonson v. International Bank*, 16 A.D.2d 55, 225 N.Y.S.2d 392 (1st Dept.), aff'd, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1962), New York courts have regularly held that the activities of a New York subsidiary can in certain circumstances be attributed to, and thus give rise to jurisdiction over, its foreign parent.

One such circumstance has traditionally been found where the New York subsidiary, though independent of the parent affiliate, 'does all the business which [its parent] could do were it here by its own officials.' *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851, 854 (1967); *see Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116 (2d Cir. 1967)."

■ While it is true that this court cannot identify any case from the United States Supreme Court which has specifically overruled the principle established in *Cudahy*, it seems apparent to this court, from multitudinous decisions of state and federal courts throughout the United States, that the principle announced twenty years later by the Supreme Court in *International Shoe, supra*, changed the older concept of jurisdiction and substantially eroded the stringent jurisdictional test applied in *Cudahy*.[5]

■ This court recognizes, when the injury claimed does not arise in the forum state —(the situation here involved)—that the test for jurisdictional presence of a foreign corporation requires more than the barest minimum contacts. In *Ratliff v. Cooper Laboratories, Inc., supra*, the court stated:

" . . . If 'plaintiff's injury does not arise out of something done in the forum state, then other contacts between the

---

5. This court is aware of the decisions of the Court of Appeals for the Fourth Circuit in *Harris v. Deere and Company*, 223 F.2d 161 (4 Cir. 1955) and *Manville Boiler Company v. Columbia Boiler Company*, 269 F.2d 600 (4 Cir. 1959). However, there is no way that this court can reconcile the logic of *Szantay*, a 1965 case, which has met universal approval, with that of *Cudahy*, unless it be that, as heretofore stated, *International Shoe*, and its progeny, have "unlaced" the bonds of *Cudahy* when extra-territorial service is authorized by statute and personal jurisdiction is predicated on due process standards. The Court of Appeals for the Fourth Circuit recognized the narrowness of the holding in *Cudahy* in its decision in *Lee v. Walworth Valve*, 482 F.2d 297, 301 (4 Cir. 1973):

"During oral argument, Walworth urged that we ignore the activities of Walworth's two wholly owned subsidiaries. We were cited to *Cannon Manufacturing Co. v. Cudahy Pack-*

*ing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634. That case held *only* that the presence of an independent subsidiary could not be equated with the presence of the parent." (emphasis added)

Surely, there can be no cause, keeping the *International Shoe* "minimum contacts" test in mind, to require a foreign corporation to defend an action in this forum when it "conducts" its entire business operation through an independently owned agent or distributor—(*Szantay*)—and not require another such corporation to defend in this forum when it acts in an identical manner by using a wholly owned agent or distributor—(*Cudahy*); this would be a distinction without a difference. In *Wells Fargo & Co., supra*, that court, citing many cases, including *Szantay*, succinctly stated:

" . . . it is clear that whether the alleged general agent was a subsidiary of the principal or independently owned is irrelevant." (556 F.2d at page 423).

corporation and the state must be *fairly extensive* before the burden of defending a suit there may be imposed upon it without offending "traditional notions of fair play and substantial justice." ' " [emphasis in original]. at p. 748.

This court is of the opinion that the contacts of VWAG in this state, based on its complete control of VWOA, meet the *Ratliff* test. *Ratliff* does not require that the forum state be a major center of the foreign corporation's business, but *Ratliff* dictates only that the forum state be a community into "whose business life the defendant had significantly entered as determined by the quality, substantiality, continuity and systematic nature of its activities." *Ratliff* at 748. VWAG has maintained continuing contact in South Carolina through VWOA's activities in this state, and, certainly, it appears to this court that to require VWAG to defend the instant suit in South Carolina can be done without "offending traditional notions of fair play and substantial justice." [6]

Defendant has asserted, as a bar to jurisdiction here, that plaintiff moved to South Carolina because South Carolina has a six-year statute of limitations for this type of action, and that South Carolina is one of the few states where plaintiff could bring suit because of the time lapse between his injuries—(1970)—and the institution of suit here—(1976). Plaintiff admits this to be a fact; however, a change of domicile for such reason is no bar to jurisdiction if the defendant is factually "present" in this jurisdiction under the principles of *International Shoe, supra,* and *Ratliff, supra.* Citizenship may be changed for the purpose of obtaining federal jurisdiction; however, for there to be a legal change of residence, there must be true intent to reside indefinitely in the new domicile. It is immaterial if a bona fide change to acquire jurisdiction, as is clearly the case here, is made for the purpose of bringing suit in the United States District Court in this state; such bona fide transfer of residence for that purpose is not a new notion. In *Miller and Lux v. East Side Canal Co.,* 211 U.S. 293, 304, 29 S.Ct. 111, 114–115, 53 L.Ed. 189 (1908), in discussing an identical issue, the Court said:

> "We do not intend by what has been said to qualify the general rule, long established, that the jurisdiction of a Circuit Court, when based on diverse citizenship, cannot be questioned upon the ground *merely* that a party's motive in acquiring citizenship in the State in which he sues was to invoke the jurisdiction of a Federal court. But that rule is attended by the condition that the acquisition of such citizenship is real, with the purpose to establish a permanent domicile in the State of

---

**6.** This court notes that the record in this case contains other facts which, while not independently sufficient, do bear generally on the "fair play and substantial justice" theory. For instance, it appears from facts stated in an affidavit, which the court finds to be true, submitted by a former Volkswagen dealer, whose dealership was located in Charleston, South Carolina, from 1955 through 1976, that VWAG representatives visited her place of business to provide her with assistance and advice in the operation of her business, and that VWAG paid the greater part of the cost of bringing Volkswagen dealers to Germany for seminars designed to improve the volume of sales by VWAG to its dealers and by its dealers to the general public. Furthermore, VWAG has recently utilized this court to bring an action for trademark infringement, alleging, among other things, in the complaint in such action—(*Volkswagen, A. G. v. Richard F. Hoffman, d/b/a The Bug House,* (D.S.C.), Columbia Division, C/A 78–1891)—that VWAG had sold

in the United States during the past thirty (30) years over six and one-half million automobiles for a value exceeding Ten Billion Dollars, that during the year 1977 alone over Thirty-Three Million Dollars was spent by VWAG for its dealers in advertising the products and services sold under VWAG's trademark in the United States, and setting forth in said complaint other indicia of control which VWAG exercises over its thirteen dealers in this state. In connection with the aforesaid action, and the insight it affords to the activities of VWAG in South Carolina, it is well to note the established principle that the owner—(VWAG)—of a trademark must retain some control over the nature and quality of its product *and over the activities of its licensees* —(the Volkswagen dealers in South Carolina)—for it to retain its rights in the trademark itself and in order to maintain the secondary meaning of the trademark. *Bramlett v. Arthur Murray, Inc.,* 250 F.Supp. 1011, 1016 (D.S.C.1966).

which he professes to be a citizen at the time of suit, and not fictitious or pretended. *Morris v. Gilmer*, 129 U.S. 315, 328 [9 S.Ct. 289, 32 L.Ed. 690, 694]."

South Carolina has a substantial interest in providing a forum for its citizens' suits against foreign corporations which are "present" in this state to the extent that we find the defendant here. Although the plaintiff moved to South Carolina for the sole purpose of instituting this action, he has conclusively proven that his South Carolina citizenship is bona fide, not temporary or illusory, and he is entitled to the same right to use the federal court in this state as any other citizen of South Carolina would possess. This court is not unmindful that the defense of litigation in a foreign jurisdiction is a burdensome inconvenience for any foreign corporation. However, such inconvenience is a part of the price that may properly be demanded of any corporation that extensively engages in international trade. When a foreign parent corporation so pervasively controls the activities of its subsidiary as the control exercised here by VWAG over VWOA, and consideration is given to the tremendous benefits from the business obtained through such relationship, a foreign corporation, like VWAG, should not be heard to complain about the burden of defending litigation in this forum. Therefore, it is

ORDERED, that the motion of the defendant, VWAG, to dismiss the complaint herein for lack of *in personam* jurisdiction be, and the same hereby is, denied.

IT IS FURTHER ORDERED, since this decision involves a controlling question of law as to which there is substantial ground for difference of opinion, and immediate appeal from this Order may materially advance the ultimate termination of this litigation, that the defendant is hereby granted the right to seek immediate relief, if it be so advised, in the Court of Appeals for the Fourth Circuit, (28 U.S.C. § 1292(b)), and, pending the seeking of such relief, further proceedings in this court are hereby stayed.

AND IT IS SO ORDERED.