**NEWPORT COMPONENTS, INC., a California corporation and Logic Array, Inc., a California corporation, Plaintiffs,**

v.

**NEC HOME ELECTRONICS (U.S.A.), INC., a Delaware corporation; NEC Corporation, a Japanese corporation; and NEC Home Electronics, Ltd., a Japanese corporation, Defendants.**

No. 86–5613–DT(Bx).

United States District Court, C.D. California.

Sept. 29, 1987.

Gary B. Lovell, Jacob J. Stettin, Newport Beach, Cal., for plaintiffs.

J. Eric Isken, Christopher C. Larkin, Graham & James, Los Angeles, Cal., for defendants.

## AMENDED OPINION AND ORDER ON MOTION TO DISMISS WITH REVISIONS

TEVRIZIAN, District Judge.

Two local electronics equipment distributors filed this action against a Japanese multi-national manufacturer of electronics products and two of its wholly-owned subsidiaries. Following several preliminary motions, the Japanese parent company and its Japanese subsidiary filed the present motion to dismiss on various procedural and substantive grounds. The Court took this matter under submission following oral argument. Having read and considered all briefs and documentary evidence presented, including the supplemental briefs filed after oral argument, the Court now grants the motion in part and denies the motion in part as follows:

## I. FACTS AND PROCEDURE

Plaintiff Newport Components, Inc. ("NCI") is a wholesale distributor of electronics products headquartered in Newport Beach, California. Plaintiff Logic Array, Inc. ("Logic") is a Newport Beach-based retailer of electronics components, and one of the vendors to whom NCI distributed its products.

Defendant NEC Home Electronics (U.S. A.), Inc. ("NECHE–USA") is a Delaware corporation engaged in the distribution of electronics equipment in the United States. NECHE–USA is a wholly-owned subsidiary of NEC America, Inc., a New York corporation not a party to this action, which is, in turn, wholly owned by defendant NEC Corporation ("NEC"), a Japanese corporation. NEC is a worldwide manufacturer and distributor of computer and communications equipment with Fiscal Year 1985–86 consolidated net sales of more than $2 billion.[1]

---

1. NEC was incorporated on July 17, 1899, as a joint venture between Western Electric Company of the United States and two Japanese individuals. Initially, the Company functioned as a sales agent for telephone equipment manufactured by Western Electric, but soon commenced production of similar equipment in Japan. In 1925, Western Electric sold its interest in NEC to International Telephone & Telegraphic ("ITT"). Seven years later the Sumitomo family holding group of Japan acquired a substantial stock interest in the company, which it sold to the public in 1948 following the passage of Japanese anti-monopoly laws. Thereafter, ITT's shareholding interest in NEC was successively reduced until 1978 when it sold its remaining interest in the company. Today, NEC is one of the twenty-one principal member companies of the Sumitomo Group.

In 1986, NEC was one of the largest manufacturers of communications systems and integrated circuits in Japan, and a leading producer of computers and industrial electronic equipment. NEC's products fall into four major categories: communications systems and equipment (accounting for thirty-two percent of consolidated net sales in 1986); computers and industrial electronic systems (thirty-six percent of net sales); electron devices (nineteen percent of net sales); and home electronics and other products (thirteen percent of net sales).

NEC, which employs more than 89,000 permanent employees, operates more than fifty manufacturing plants in Japan and ten more overseas. The company sells its products through more than 200 domestic sales offices and more than 120 overseas offices situated in twenty-nine countries. In addition, it owns more than twenty non-consolidated subsidiaries throughout the world, including several in the United States. In the year ending March 31, 1986, NEC's consolidated net sales totaled more than $2 billion and its consolidated net income

Defendant NEC Home Electronics, Ltd. ("NECHE–Japan"), a Japanese corporation, is a separate wholly-owned subsidiary of NEC that both distributes NEC's products and manufactures its own computer equipment for sale at the retail level.

On November 27, 1985, NCI and NECHE–USA entered into a written distributorship agreement under which NCI would distribute to retail dealers, among other NEC products, a self-synchronizing high resolution color computer monitor marketed under the trade name "Multi-Sync."[2] The present dispute arose when NECHE–USA terminated this distributorship agreement on July 28, 1986.[3]

Plaintiffs allege that NECHE–USA wrongfully terminated NCI as part of a conspiracy to fix prices and restrain competition in the high resolution color monitor market. Specifically, they allege in relevant part that "distributors, such as NCI, who sell too cheaply to retailers, such as Logic Array, are terminated as distributors whereas those distributors who comply with [d]efendants' pricing instructions are not terminated and are rewarded for their participation in the conspiracy to maintain high prices." Complaint, ¶ 24(a).[4]

Plaintiffs filed this action on August 27, 1986, and at the same time sought a Temporary Restraining Order ("TRO") preventing NECHE–USA from terminating the November 27, 1985, distributorship agreement. This Court granted the TRO with the condition that plaintiffs not place additional orders for products with NECHE–USA. On September 8, 1986, the Court denied plaintiffs' application for a preliminary injunction preventing NECHE–USA from terminating the distributorship, but enjoined NECHE–USA from refusing to sell and deliver to NCI all back-ordered MultiSync monitors on the same terms and conditions afforded other authorized NECHE–USA distributors. The Court also stayed this action pending arbitration pursuant to an arbitration clause in the distributorship agreement, but allowed discovery

---

exceeded $27 million. Approximately thirty-three percent of these sales were to customers outside Japan. By any standard, NEC has achieved the status of a multinational corporation. *See generally*, M. Yoshino, *Japan's Multinational Enterprises* (1976).

**2.** Three basic classes of personal computer monitors exist in the marketplace today. One class, known as the "Amber/Green" monitor, is useful for basic office computer functions such as word processing or numerical calculations, but has no real utility in situations demanding higher level graphics capability. A second class, the "RGB" (Red, Green, Blue) monitors, permits the use of computers in more graphically demanding situations, but remains limited in both color and resolution capability. Finally, the class of high resolution color monitors including the MultiSync is designed to perform the most complex graphics available, including "EGA" (Enhanced Graphic Applications), "CGA" (Color Graphic Applications), "PGA" (Professional Graphics Applications), and "CAD/CAM" (Computer Aided Design/Computer Aided Manufacturing).

Every high resolution color monitor must utilize a device known as a "color board" between the monitor and the computer. Different color boards exist for different computer applications, and until recently a user had to choose a separate compatible monitor for each color board with which the user worked. According to plaintiffs' complaint, the MultiSync's uniqueness lies in its ability to automatically adjust to virtually all presently manufactured color boards, thus allowing the user to employ one monitor with a wide variety of boards. In addition, the MultiSync is likely to be compatible with future color boards as they become available on the market. *See* Complaint, paras. 10–18. Defendant NECHE–Japan manufactured the MultiSync monitors distributed by NECHE–USA to NCI.

**3.** The agreement provided that either party could terminate the distributorship "without cause" by giving the other party thirty (30) days written notice. It is uncontroverted that NECHE–USA gave NCI the proper notice.

**4.** Plaintiffs allege the following causes of action: (1) conspiracy to restrain trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; (2) price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13; (3) monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) violation of Section 73 of the Wilson Tariff Act of 1894, 15 U.S.C. § 8; (5) violation of the Cartwright Act, California Business & Professions Code §§ 16720, 16722, 16726, 16727, 16750; (6) unfair competition; (7) interference with contractual relations; (8) interference with prospective advantage; (9) violation of franchise law; (10) breach of the covenant of good faith and fair dealing; and (11) relief in the form of an order determining non-arbitrability. Complaint, August 27, 1986.

to proceed on the federal and state antitrust claims. Plaintiffs undertook mail service of the summons and complaint separately on defendants NEC and NECHE–Japan on December 20, 1986.

## II. PRESENT MOTIONS BEFORE THE COURT

NEC and NECHE–Japan filed the present motion to dismiss pursuant to Rules 4 and 12 of the Federal Rules of Civil Procedure as follows:

(1) To dismiss all causes of action against NEC on the ground the Court lacks jurisdiction over the person of NEC (Fed.R.Civ.Proc. 12(b)(2));

(2) To dismiss all causes of action against NEC and NECHE–Japan on the ground these defendants have not been properly served with process (Fed.R.Civ.Proc. 12(b)(5));

(3) To dismiss all causes of action against NEC and NECHE–Japan for failure to effect service of process within 120 days after the complaint was filed (Fed.R.Civ.Proc. (4)(j)); and

(4) To dismiss the first, third, fourth, fifth, and sixth causes of action against NEC and NECHE–Japan for failure to state a claim upon which relief can be granted (Fed.R.Civ.Proc. 12(b)(6)).

## III. JURISDICTION OVER THE PERSON

NEC moves to be dismissed from this action for lack of *in personam* jurisdiction. This defendant argues that although it admittedly markets its products in California through NECHE–USA and other wholly-owned subsidiaries, it does not have sufficient contacts itself with the forum state to confer personal jurisdiction.

Due process protects a corporate entity from being brought into a forum with which it has established no meaningful " 'contacts, ties, or relations.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Due process require-

ments are satisfied, however, when *in personam* jurisdiction is asserted over a nonresident corporate defendant that has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe, supra*, 326 U.S. at 316, 66 S.Ct. at 158, *quoting Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940); *Asahi Metal, Inc. v. Superior Court*, —— U.S. ——, 107 S.Ct. 1026, 1031, 94 L.Ed.2d 92 (1987); *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). At bottom, a nonresident "[d]efendant's conduct and connection with the forum state [should be] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Burger King, supra*, 105 S.Ct. at 2182 (defendant must have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign"), *quoting Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in judgment). The issue presented here is whether NEC's contacts with the forum are such that it could have anticipated being subject to the present litigation.

### A. *Standard of Review*

Plaintiffs, as the parties seeking to invoke the Court's jurisdiction, bear the burden of establishing that personal jurisdiction exists. *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir.1986); *Data Disc., Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). On a motion to dismiss, plaintiffs are " 'obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.' " *Scott, supra, quoting Amba Marketing Systems, Inc. v. Jobar International, Inc.*, 551 F.2d 784, 787 (9th Cir.1977). At this stage in the litigation, however, with discovery ongoing, plaintiffs need not establish jurisdiction by a preponderance of evidence but may merely set forth a *prima facie* showing that

NEC is properly before the Court. *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.1986); *Data Disc., supra,* 557 F.2d at 1285; *California Software, Inc. v. Reliability Research,* 631 F.Supp. 1356, 1359 (C.D.Cal.1986).

In an effort to make this prima facie showing, plaintiffs rely on three distinct theories of personal jurisdiction. First, they argue that this Court has "specific jurisdiction" over NEC by virtue of a relationship among NEC, California as the forum state, and the present litigation. Second, they argue that "general jurisdiction" exists over NEC on the basis of this defendant's overall contacts with the forum state. Finally, although not clearly articulated, plaintiffs appear to claim the Court has jurisdiction over NEC in light of this defendant's "aggregate" or "cumulative" contacts with the United States as a whole. To support these theories, plaintiffs present evidence of the following uncontroverted facts:

(1) One of NEC's wholly-owned California subsidiaries, NEC Electronics, Inc. ("NEC Electronics"), imports ninety percent of the NEC computer chips it sells from the parent company. Moreover, NEC retains "control" of this subsidiary by virtue of the fact that NEC corporate directors constitute a majority of NEC Electronics' board of directors.

(2) Prior to November, 1983, NEC was the owner within the United States of the trademark "NEC," registered with the United States Patent & Trademark Office under Registration Nos. 964,056 and 1,070,-387. In November, 1983, NEC transferred this trademark to NEC Electronics. NEC also has placed advertisements promoting this trademark in various publications circulated in the United States;

(3) NEC has voluntarily availed itself of the federal courts to redress grievances;

(4) Since at least 1963 and continuing to date, NEC has registered with the United States Securities and Exchange Commission and actively traded on the over-the-counter market American Deposit Receipts ("ADRs"); and

(5) During the 1970's and 1980's NEC has been investigated by the United States Department of Commerce for "dumping" foreign-made televisions sets on the United States market.

For its part, NEC provides uncontroverted evidence through the affidavit of Mr. Yuji Ohashi, a former General Manager of NEC's International Planning Division, that NEC has no officers, employees, or agents anywhere in the United States, and does not own any real or personal property in this country. Defendants' evidence further indicates that NEC did not manufacture the MultiSync monitors at issue in this dispute, did not enter into or terminate NCI's distributorship agreement with NECHE–USA, and did not direct NECHE–USA to terminate this agreement.[5]

To determine whether personal jurisdiction over NEC exists, the Court must sift through these uncontroverted facts and apply them in turn to each of plaintiffs' three theories.

**B.** *Specific Jurisdiction: NEC's Relationship with the Present Litigation*

▮▮▮ To establish specific jurisdiction over NEC, plaintiffs must show a "relationship among the defendant, the forum and the litigation." *Helicopteros, supra,* 466 U.S. at 414, 104 S.Ct. at 1872, *citing Shaffer, supra,* 433 U.S. at 204, 97 S.Ct. at 2580. The Ninth Circuit has established

---

**5.** Plaintiffs raise several evidentiary objections to Mr. Ohashi's declaration, including lack of competence, hearsay, and failure to execute the declaration in conformity with the California Code of Civil Procedure. Plaintiffs do not, however, articulate the reasoning behind their objections. According to his declaration, Mr. Ohashi served in several positions at NEC between 1965 and 1985, including most recently as General Manager of NEC's International Planning Divi-

sion. In May 1985, Mr. Ohashi left NEC and assumed his present position as NECHE–USA's president. From his long association with both NEC and NECHE–USA, Mr. Ohashi attests to personal knowledge of the NECHE–USA/NCI distributorship agreement. Accordingly, the Court finds that plaintiffs' competence and hearsay objections are without merit. Moreover, the Court finds that Mr. Ohashi's declaration was properly drafted and executed.

the following three-part test for determining whether specific jurisdiction exists over a foreign defendant:

"(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the laws.

(2) the claim must be one which arises out of or results from the defendant's forum-related activities.

(3) exercise of jurisdiction must be reasonable."

*Hirsch v. Blue Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1477 (9th Cir.1986), *quoting Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986); *Data Disc, supra,* 557 F.2d at 1287.

Plaintiffs have failed to produce any evidence demonstrating that their claims either arose out of or are related to any of NEC's contacts with California. Their

complaint does allege that NEC "conspired" with others to fix prices, monopolize the market in high-resolution self-synchronizing monitors, and unlawfully terminate NCI as a distributor of NEC products. However, plaintiffs fail to offer any evidence to controvert the declaration of Mr. Ohashi stating that NEC did not terminate NCI's distributorship, and that NEC's only contact with this litigation is that it is the parent corporate entity of the defendant corporations which manufacturer and distribute the MultiSync. In short, plaintiffs fail to put forth any evidence linking NEC's alleged wrongful actions to any of NEC's alleged contacts with the forum.[6] On a motion to dismiss for lack of personal jurisdiction, plaintiffs may not rest on their pleadings but instead must offer at least some facts, through affidavits or other evidence, supporting jurisdiction. *Scott, supra,* 792 F.2d at 927. Accordingly, the Court finds that plaintiffs have not sustained their burden of demonstrating specific jurisdiction over defendant NEC.[7]

**6.** Plaintiffs argue that NEC subjected itself to the personal jurisdiction of this Court by issuing orders from Japan to NECHE–USA which resulted in the termination of NCI's distributorship. It is true, as the Ninth Circuit has noted, that "[a] foreign act having an effect in the forum may satisfy the minimum contacts requirement" for personal jurisdiction. *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1178 (9th Cir.1980). However, "in each such case the defendant must have done some act by which it purposefully avails itself of the benefits and protections of forum law." *Id.* Here, plaintiffs offer no evidence that NEC in fact was involved in the decision to terminate NCI's distributorship. Without such evidence, the Court may not sustain *in personam* jurisdiction on the basis of this single alleged act. *Scott, supra,* 792 F.2d at 927.

**7.** Plaintiffs rely heavily on the Supreme Court's recent decision in *Asahi, supra.* In *Asahi,* a specific jurisdiction case, a plaintiff injured in a motorcycle accident when the vehicle's tire and tube exploded filed a product liability action against, *inter alia,* the Taiwanese manufacturer of the tube. The tube manufacturer in turn cross-complained against the Japanese manufacturer of the valve stem assembly used in the tube. *Id.* at 1029. Other than manufacturing the valve stem incorporated into tubes ultimately used in California, the Japanese company had no other contacts with the forum state. The United States Supreme Court reversed a California Supreme Court decision upholding personal

jurisdiction over the Japanese manufacturer. Eight Justices agreed that the exercise of jurisdiction over this party would violate the principles of fair play and substantial justice under the Fourteenth Amendment. Four Justices went further and argued that the mere placement of a product in the stream of commerce, without more, is not sufficient to confer jurisdiction over a foreign defendant even if it is aware that the stream will sweep the product into the forum state. *Id.* 1033 (O'Connor, J., joined by Rehnquist, C.J., Powell, J., and Scalia, J.).

*Asahi* does not directly apply in the present action since, as discussed above, plaintiffs have not demonstrated the prerequisites for specific jurisdiction. However, the case suggests generally that courts must apply a higher standard of review to the forum contacts of foreign defendants than they do to the contacts of domestic defendants. As Justice O'Connor, writing for the Court, notes: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 1034; *accord United States v. First National City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field"); *Pacific Atlantic Trading Co. v. M/V Main Ex-*

C. *General Jurisdiction: NEC's Contacts with California*

█ To determine whether general jurisdiction exists based on a defendant's contacts with the forum state, district courts must first examine the state's long-arm statute. *Hunt v. Erie Ins. Group*, 728 F.2d 1244, 1246 (9th Cir.1984). In California, Code of Civil Procedure § 410.10 permits the exercise of jurisdiction over a non-resident defendant on any basis not inconsistent with the California or United States Constitutions. California Code of Civil Procedure § 410.10 (West 1973); *Kransco MGG, Inc. v. Markwitz*, 656 F.2d 1376, 1377–78 (9th Cir.1981); *Republic Intern. Corp. v. Amco Engineers, Inc.*, 516 F.2d 161, 167 (9th Cir.1975); *Neadeau v. Foster*, 129 Cal.App.3d 234, 180 Cal.Rptr. 806 (1982). In turn, the Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes certain limits on a court's power to exert personal jurisdiction over an out-of-state defendant. *Asahi, supra*, — U.S. ——, 107 S.Ct. 1026, 1031, 94 L.Ed.2d 92 (1987). Specifically, plaintiffs must demonstrate that NEC has "substantial" or "continuous and systematic" contacts with California, notwithstanding the fact that plaintiffs' claims are unrelated to NEC's forum activities. *Helicopteros, supra*, 446 U.S. at 415, 104 S.Ct. at 1872, *citing Perkins v. Beneqet Consolidated Mining Co.*, 342 U.S. 437, 445, 72

S.Ct. 413, 418, 96 L.Ed. 485 (1952); *see also Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir.1984), *cert. denied, Merchent v. Cubbage*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Data Disc, supra*, 557 F.2d at 1286.

As at least one court has noted, these guidelines for determining general jurisdiction are nothing more than "vaguely stated principles" which must be applied to complex fact situations. *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 248 (W.D.Mo.1985). Nevertheless, the Supreme Court's most recent pronouncement on the subject provides a benchmark for lower courts to follow. In *Helicopteros*, a wrongful death action against several defendants, the Court held that a Texas state court could not assert personal jurisdiction over a Colombian corporation which had sent its chief executive officer to Houston to negotiate a contract, purchased $4 million worth of helicopters and parts from a Texas firm, and sent pilots, managers and maintenance personnel to be trained in the forum state. *Helicopteros, supra*, 466 U.S. at 411–12, 416–19, 104 S.Ct. at 1873–74. In the present action this Court must look for contacts between NEC and California which exceed this bare minimum.[8]

As the Ninth Circuit has recently acknowledged, the *Helicopteros* standard for general jurisdiction is a high one in practice. *Fields, supra* 796 F.2d at 301. To

*press*, 758 F.2d 1325, 1330 (9th Cir.1985) ("When the non-resident defendant is from a foreign nation ..., the sovereignty barrier is higher, undermining the reasonableness of jurisdiction"); *Rocke v. Canadian Automobile Sport Club*, 660 F.2d 395, 399 (9th Cir.1981) (same). This Court is mindful of Justice O'Connor's admonition. Nevertheless, while "litigation in a foreign jurisdiction is a burdensome inconvenience for any company, in the appropriate case, where defendant's activities abroad, either directly or through an agent, become widespread and energetic ...' such litigation is 'part of the price which may be properly demanded of those who extensively engage in international trade.'" *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F.Supp. 1322, 1334–35 (E.D.N.Y.1981), *quoting Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 539, 281 N.Y.S.2d 41, 45, 227 N.E.2d 851, 854 (1967).

**8.** In *Helicopteros*, Justice Blackmun contrasts the insufficient forum contacts of the Colombi-

an corporation with what the Court determined to be adequate contacts of a foreign defendant in *Perkins, supra*. *Helicopteros, supra*, 466 U.S. at 414–15, 104 S.Ct. at 1872. In *Perkins*, the Supreme Court upheld general jurisdiction over a Philippine mining corporation which maintained an office in Ohio from which it conducted business, kept company files, held directors' meetings, carried on correspondence, issued paychecks drawn on two Ohio bank accounts, and engaged a local bank to act as its transfer agent. *Perkins, supra*, 342 U.S. at 438, 72 S.Ct. at 414–15. *Perkins* and *Helicopteros* appear to form a continuum upon which district courts can measure the sufficiency of a defendant's contacts with the forum state for personal jurisdiction purposes. Based on the evidence presented to date in the instant action, the Court believes that NEC's contacts with California fall somewhere midway between *Perkins* and *Helicopteros* on this continuum.

operationalize this standard the circuit has identified various factors a district court should consider in determining whether general jurisdiction exists, "including whether the defendant makes sales, solicits or engages in business, serves the forum state's markets, designates an agent for service of process, holds a license, has employees, or is incorporated [in the forum state]." *Hirsch, supra,* 800 F.2d at 1478.

To support their claim of general jurisdiction, plaintiffs rely primarily on the following passage from the recent Ninth Circuit opinion in *NEC Electronics v. Cal Circuit Abco,* 810 F.2d 1506 (9th Cir.1987):

> "[NEC] is one of the world's largest manufacturers of computer chips, reporting sales of nearly $2 billion dollars in 1985. [NEC Electronics] is a wholly-owned subsidiary whose control remains primarily vested in the parent; [NEC] directors constitute a majority of [NEC Electronics'] board of directors. [NEC Electronics] manufactures some computer chips at its own facilities in the United States, but imports ninety percent of the NEC chips it sells from the parent company." [9]

*Id.* at 1507. Plaintiffs contend that through NEC's "control" of NEC Electronics, the foreign parent corporation is directly soliciting business in, making sales in, and generally doing business in California. *Hirsch,* 800 F.2d at 1478.

[] It is firmly established that a nonresident parent corporation is not subject to personal jurisdiction based solely on the independent activities of its wholly-owned subsidiary. *See, e.g., Kramer, supra,* 628 F.2d at 1177 (some common members of the boards of directors and parent approval of United States subsidiary's proposal for consolidating distribution of automobiles not sufficient to make subsidiary an "alter ego" or "agent" of British parent); *Mizokami Bros of Ariz., Inc. v. Baychem Corp.,* 556 F.2d 975, 977 (9th Cir.1977) ("mere existence of the parent-subsidiary relationship is not alone a sufficient basis for long-arm jurisdiction of the parent"), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1977); *O.S.C. Corp. v. Toshiba America, Inc.,* 491 F.2d 1064, 1067–68 (9th Cir.1974) (California court lacked jurisdiction over Japanese parent corporation which sold its products to a wholly-owned New York subsidiary which in turn delivered products to customers in California); *Ryder Truck Rental v. Acton Foodservices Corp.,* 554 F.Supp. 277, 279 (C.D.Cal. 1983) (no jurisdiction over foreign parent absent " 'clear evidence that the parent in fact controls the activities of the subsidiary' "); *Williams v. Cannon, Inc.,* 432 F.Supp. 376, 379–80 (C.D.Cal.1977) (no jurisdiction over Japanese parent corporation where plaintiff fails to show parent both controlled and managed the internal affairs of subsidiary); *see generally Cannon Manufacturing Co. v. Cudahy Co.,* 267 U.S. 333, 335–37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); Wright & Miller, *Federal Practice & Procedure,* Section 1069, p. 256 ("if the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary"). This rule applies even when the separation between parent and subsidiary is "merely formal," as long as it is "real." *Cannon Mfg., supra,* 267 U.S. at 336–37, 45 S.Ct. at 251; *Ryder, supra,* 554 F.Supp. at 279; *Williams, supra,* 432 F.Supp. at 379.[10]

---

9. NEC Electronics, Inc. is a wholly-owned United States subsidiary of NEC. The company manufactures, imports, and sells electronics equipment bearing the "NEC" trademark for distribution throughout California. NEC Electronics employs approximately 400 workers at its manufacturing, assembly, and testing facility in Roseville, California. To date, the company has invested over $100,000,000 in its Roseville plant, and intends to employ 2,900 employees by the year 1990. Although NEC Electronic is not a party to the present action, its relationship with NEC may nevertheless form the basis of general jurisdiction over NEC. *Roorda v. Volkswagenwerk, A.G.,* 481 F.Supp. 868, 869–70 (D.S.C.1979) (general jurisdiction over parent foreign corporation based on the contacts of the New Jersey corporation which was its "sole importer," even though New Jersey corporation was dismissed from action).

10. Defendants rely on *Cannon* and its progeny. For almost fifty years, *Cannon* has stood for the

It is equally well settled, however, that where a nonresident parent corporation carries on "continuous and systematic" activities in the forum state through a subsidiary, due process is not offended by the exercise of personal jurisdiction over the parent entity. *See, e.g., Wells Fargo, supra,* 556 F.2d at 424 ("if plaintiffs can establish that [the alien corporate defendant] was carrying on 'continuous and systematic' activities in Nevada through [its subsidiary] acting as [the alien defendant's] 'general agent,' we see no reason why [the alien defendant] itself should not be said to have been present there"); *Brunswick Corp., supra,* 575 F.Supp at 1419 (Japanese parent companies' contacts with Wisconsin satisfied the state's long-arm statute where parent companies had systematically injected themselves in Wisconsin market-place through their affiliated subsidiaries, local sales of parent companies' products were not isolated or insubstantial, and economic benefits accruing to parent companies by virtue of Wisconsin connections rendered exercise of long-arm jurisdiction reasonable); *Scott v. Mego Int'l Inc.,* 519 F.Supp 1118, 1125–26 (D.Minn.1981) ("A nonresident parent corporation may subject itself to jurisdiction in a state by virtue of the activities of its subsidiary company in that state" if the companies are "organized and operated so that one corporation is an instrumentality or adjunct of the other"); *Bulova, supra,* 508 F.Supp. at 1333 ("a corporation may be amenable to New York jurisdiction when the systematic activities of a subsidiary in the state may fairly be attributed to the parent"); *see generally, Roorda, supra,* 481 F.Supp. at 874–79 (and

proposition that mere ownership of a subsidiary without more does not subject the foreign parent to the jurisdiction of the state in which the subsidiary transacts business. *See e.g., State of Idaho v. Bunker Hill Co.,* 635 F.Supp 665, 670 (D.Idaho 1986); *United States v. Bliss,* 108 F.R.D. 127, 131 (E.D.Mo.1985); *Williams, supra,* 432 F.Supp. at 379; *Westinghouse Electric Corp. v. Superior Court,* 17 Cal.3d 259, 274, 131 Cal. Rptr. 231, 551 P.2d 847 (1976). In *Cannon,* a North Carolina corporation brought a breach of contract action against both a marine corporation and the wholly-owned subsidiary it employed to market the parent company's products in North Carolina. Plaintiff effected service of process on the subsidiary but not on the parent corporation. Although the uncontested facts indicated that the parent in fact controlled and dominated the subsidiary, the Supreme Court held that since the two were formally separate corporate entities, and the separation was sufficiently "real", the state court could not assume personal jurisdiction over the parent corporation. *Id.,* 267 U.S. at 336–37, 45 S.Ct. at 251.

Numerous courts have gone to great lengths to distinguish or otherwise avoid the stringent principle announced in *Cannon. See e.g., Brunswick Corp. v. Suzuki Motor Co., Ltd.,* 575 F.Supp. 1412, 1418–21 (E.D.Wis.1983) (continuing validity of *Cannon* "doubtful" in light of *International Shoe*); *Consolidated Engineering Co., Inc. v. Southern Steel Co.,* 88 F.R.D. 233, 237–38 (E.D.Va.1980) ("*Cannon* is simply apposite to long-arm cases. The decision in *Cannon* was limited to an analysis of local service of process on a domestic subsidiary as a means of effecting process on an absent corporate parent"); *Energy Reserves Group, Inc. v. Superior Oil Co.,* 460 F.Supp. 483, 502–03 (D.Kan.1978) (speculating that only two narrow statutory ap-

plications of *Cannon* survive *International Shoe*); *Roorda v. Volkswagenwerk, A.G.,* 481 F.Supp. 868, 877–81 (D.S.C.1979) ("it seems apparent to this court, from multitudinous decisions of state and federal courts throughout the United States, that the principle announced by the Supreme Court in *International Shoe, supra,* changed the older concept of jurisdiction and substantially eroded the stringent jurisdiction test applied in [*Cannon*]"); *see also Stoehr v. American Honda Motor Co, Inc.,* 429 F.Supp. 763, 766 (D.Neb.1977); *W. Clay Jackson Enterprises v. Greyhound Corp.,* 431 F.Supp. 1229, 1232 (D.Puerto Rico 1977); *Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa,* 428 F.Supp. 1237, 1242, n. 1 (S.D.N.Y. 1977); *Fisher v. First National Bank of Omaha,* 338 F.Supp. 525, 529 (S.D.Iowa 1972) *appeal dismissed,* 466 F.2d 511 (1972). These and other modern courts have implicitly recognized that as the international economy becomes more interdependent, the formal but artificial separation between a foreign parent corporation and its domestic subsidiary becomes less compelling for purposes of determining personal jurisdiction. Moreover, with the increasing domination of the world economy by multinational corporations, it is appropriate to look to the parent company (i.e., the "hub of the wheel") when its subsidiaries (i.e., the "spokes of the wheel") violate substantive rights in foreign countries. *See Bulova, supra,* 508 F.Supp. at 1333–1345 (in-depth analysis of the relationship between personal jurisdiction and multinational corporations, including Japanese multinationals). The Court agrees with this trend in the law toward greater accountability by foreign corporate entities, and will accordingly look to the "real" rather than the "formal" relationship between NEC and its subsidiaries in deciding the jurisdiction issue. *Id.* at 1340.

cases cited therein); Wright & Miller, *supra*, at 256 ("if the subsidiary is merely an agent through which the parent conducts business in the jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary"). Moreover, the existence of interlocking directorates, while not dispositive by itself, constitutes strong evidence of a relationship sufficient to confer personal jurisdiction over the parent corporation. *See e.g., Scott, supra,* 1118 F.Supp. at 1126; *Bulova,* 508 F.Supp. at 1340; *Tokyo Boeki (U.S.A.),* 324 F.Supp. 361, 366 (S.D.N.Y.1971).

■ In determining whether a parent corporation has interjected itself into the forum through a subsidiary in the antitrust context, courts have identified the following factors, among others, as relevant to the decision:

"(1) Whether there is a world-wide partnership in business competition between parent and subsidiary; (2) whether the parent has the capacity to influence decisions of the subsidiary in matters having antitrust consequences (e.g., interlocking directors and officers); (3) whether there is an integrated manufacturing, sales and distribution system; and (4) whether the subsidiary is the marketing arm of the parent and shares a common marketing image (e.g., through advertising and a common trademark)."

*Cascade Steel v. C. Itoh & Co. (America),* 499 F.Supp. 829, 838 (D.Ore.1980), *citing Zenith Radio Corp. v. Matsushita Elec. Ind. Co., Ltd.,* 402 F.Supp. 262, 327–28 (E.D.Pa.1975). In the instant case, the preliminary evidence indicates that at least some if not all of these factors are present in the NEC–NEC Electronics relationship. First, NEC and NEC Electronics are certainly part of a world-wide effort to compete in the computer equipment market. *NEC Electronics v. Cal Circuit Abco, supra,* 810 F.2d at 1507 (parent and subsidiary are part of a $2 billion-a-year corporate network). Second, NEC and NEC Electronics have an interlocking directorship such that NEC can influence or control the decisions of its California subsidiary. *Id.* (NEC's directors constitute a majority of NEC Electronics' board of directors). Third, NEC and NEC Electronics appear to have an integrated manufacturing, sales and distribution system through which NEC Electronics imports ninety percent of the products it sells in California from NEC. *Id.* (NEC Electronics "imports ninety percent of the NEC chips it sells from the parent company"). Finally, NEC and NEC Electronics clearly share a common marketing image through the common use of the trademark "NEC." *Id.* (in 1983, NEC assigned its United States rights to the trademark "NEC" to NEC Electronics).

Although these facts alone are not sufficient to demonstrate general jurisdiction by a preponderance of evidence, they are adequate to make a *prima facie* showing sufficient to withstand the present motion to dismiss. Additional questions remain, however, which should be addressed following further discovery, including the variety and volume of products NEC markets in California; the degree to which NEC dictates or facilitates the marketing of these products; the extent to which NEC directly or indirectly controls the corporate decisions of, and does business through, NEC Electronics or other wholly-owned subsidiaries operating in California; and the extent to which NEC controls the day-to-day operations of these subsidiaries.[11]

11. Plaintiffs again rely heavily on *Asahi, supra,* this time to support their general jurisdiction argument. However, as discussed above, *supra* at footnote 5, *Asahi* is a specific jurisdiction case not directly applicable to the issue of general jurisdiction. Nevertheless, Justice O'Connor's plurality opinion in *Asahi* offers an important parallel to general jurisdiction cases. Justice O'Connor, writing for four Justices, identifies four examples of conduct in addition to placing a product into the stream of commerce which she considers sufficient to satisfy the requirements of due process in specific jurisdiction cases:

"Additional conduct of a defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers

### D. "National Contacts" Theory: NEC's Contacts with the United States

■ In certain cases, courts have held that personal jurisdiction over a foreign corporate defendant being sued on a federal cause of action " 'may be founded on that defendant's contacts with the United states as a whole instead of its contacts with the forum state.' " *See, e.g., Handley v. Indiana & Michigan Elec. Co.*, 732 F.2d 1265, 1268–69 (6th Cir.1984), *quoting Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237–38 (6th Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981). This "national contacts" or "aggregate contacts" or "cumulative contacts" theory is " 'based on the proposition that a court's jurisdictional power to render a binding judgment on federal questions must be examined in light of the due process clause of the Fifth rather than the Fourteenth Amendment.' " *Id.* This theory allows a court to obtain personal jurisdiction over a foreign corporate defendant which has substantial contacts with the United States as a whole, even when its contacts with the forum state are insufficient to pass due process muster. *See, e.g., Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir.1974); *see generally*, Born, "Reflections on Judicial Jurisdiction in International Cases," 17 *The Georgia Journal of International and Comparative Law*, 1, 9–10 (1987); Note, "National Contacts as a Basis for In Personam Jurisdiction Over Aliens In Federal Question Suits," 70 *Calif. L.Rev.* 686 (1982); Note, "Alien Corporations and Aggregate Contacts: A Genuinely Federal Standard," 95 *Harv.L.Rev.* 470, 474–81 (1981).[12]

The Ninth Circuit has not yet considered the validity of asserting personal jurisdiction over an alien defendant in an anti-trust action based on that defendant's aggregate or cumulative contacts with the United States. However, the Circuit has upheld this basis for jurisdiction in another context where, as here, the statute under which the plaintiff sued provides for nation-wide service of process on the foreign defendant. In *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985), the court reversed a lower court's order dismissing four nonresident defendants in a securities fraud action for lack of personal jurisdiction. In adopting the national contacts approach, the court undertook a two-step analysis. First, it found that § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, authorizes nationwide service of process in securities actions. *Id.* at 1314 n. 1. Second, the court held that due process was not offended where the defendant had "sufficient contacts with the United States" to justify asserting personal jurisdiction. *Id.* at 1315. The court stated that

" ' 'minimum contacts' with a particular ... state for purposes of personal juris-

in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi, supra*, 107 S.Ct. at 1033. Significantly, these factors are also relevant to determining whether or not general jurisdiction exists over a particular defendant. *See e.g., Hirsch, supra*, 800 F.2d at 1478 (relevant factors include whether the foreign defendant makes sales, solicits or engages in business, or serves the forum state's markets); *Wentling v. Popular Science Pub. Co.*, 176 F.Supp. 652, 659 (D.C.Pa.1959); (foreign defendant's forum contacts in antitrust case included advertising and sales promotion campaigns); *Brunswick, supra*, 575 F.Supp. at 1419 (personal jurisdiction over parent corporations proper when parent companies systematically injected themselves into forum state's markets through subsidiary); *Wells Fargo, supra*, 556 F.2d at 424 (personal jurisdiction over parent corporation proper where subsidiary acted as "general agent" of the parent). Here, plaintiffs have alleged the presence of each of these factors in the NEC–NEC Electronics relationship. And although plaintiffs' evidence is not sufficient to establish personal jurisdiction at this time, the Court considers these factors highly relevant to its final determination of the personal jurisdiction issue.

12. The Supreme Court has not yet considered the constitutionality of the national contacts theory of personal jurisdiction. *See Asahi, supra*, 107 S.Ct. at 1033 n **. ("We have no occasion here to determine whether Congress could, consistent with the Due Process Clause of the Fifth Amendment, authorize federal court personal jurisdiction over alien defendants based on the aggregate of national contacts, rather than on the contacts between the defendant and the State in which the federal court sits.")

diction is *not* a limitation imposed on the federal courts in a federal question case by due process concerns. The Constitution does not require the federal districts to follow state boundaries....' *Johnson Creative Arts v. Wool Masters,* 743 F.2d 947, 950 (1st Cir.1984). Where a federal statute such as Section 27 of the [Securities Exchange] Act confers nationwide service of process, 'the question becomes whether the party has sufficient contacts with the United States, not any particular state.' *Nelson v. Quimby Island Reclamation District,* 491 F.Supp. 1364, 1378 (N.D.Cal.1980....*"

*Id.* (emphasis original; citations and footnotes omitted); *see also Leasco Data Processing v. Maxwell,* 468 F.2d 1326, 1339–43 (2d Cir.1972) (same); *Paulson Inv. Co. v. Norbay Sec., Inc.,* 603 F.Supp 615, 618 (D.Ore.1984) (same). Accordingly, the court held that "so long as a defendant has minimum contacts with the United States, § 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

Similarly, the Northern District of California has applied the national contacts theory to actions brought against foreign governments acting as private entities under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* In *Meadows v. Dominican Republic,* 628 F.Supp. 599 (N.D.Cal.1986), *affirmed,* 720 F.2d 684 (9th Cir.1987), Judge Schwarzer applied the two-step analysis adopted in *Securities Investor.* First, the court found that FSIA provides for world-wide service of process under 28 U.S.C. § 1330, *Id.* at 606. Second, it concluded that "it is the federal court, not the state, that exercises jurisdiction over defendants, and the relevant contacts are those with the United States generally." *Id.* at 607; *accord Ver-*

*linden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983) (personal jurisdiction under the FSIA is only limited by the requirement of "some form of substantial contact with the United States"); *Texas Trading v. Federal Republic of Nigeria,* 647 F.2d 300, 314 (2nd Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) ("[s]ince service [of process] was made under Section 1608, the relevant area in delineating contacts is the entire United States, not merely New York [the forum state]").

*Securities Investor* and *Meadows* provide a model for extending the national contacts theory of personal jurisdiction by analogy to the antitrust area. First, 15 U.S.C. § 22 authorizes service of antitrust complaints "in any district wherein [the defendant] may be found or transacts business." [13] The Ninth Circuit has held this statute authorizes not only nationwide but worldwide service of process. *Kramer, supra,* 628 F.2d at 1177; [14] *Wells Fargo, supra,* 556 F.2d at 418; *see also Meadows, supra,* 628 F.Supp. at 607. Second, once the prerequisites of § 22 are met "'the question becomes whether the [corporate defendant] has sufficient contacts with the United States, not any particular state.'" *Securities Investor, supra,* 764 F.2d at 1315; *Kramer, supra,* 628 F.2d at 1177; *Wells Fargo, supra* 556 F.2d at 418; *see also Black v. Acme Markets, Inc.,* 564 F.2d 681, 683–86 (5th Cir.1977); *Bamford v. Hobbs,* 569 F.Supp. 160, 164–67 (S.D.T. 1983); Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust Actions in the Federal Courts: A Policy Analysis,* 67 Iowa L.Rev. 485, 501 (1982).

■ Applying the national contracts theory to the uncontroverted facts in the

---

**13.** 15 U.S.C. § 22 provides:
District in which to sue corporation.
Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

This language parallels the wording in 15 U.S.C. § 78aa, used as the basis for personal jurisdiction in *Securities Investor, supra* at 1314 n. 1.

**14.** *Kramer* expressly reserved the issue of whether national contacts theory applies in the antitrust context. *Kramer supra,* 628 F.2d at 1177 n. 4.

present record, the Court finds that plaintiffs have made a prima facie showing that NEC has sufficient contacts with the United States generally to confer personal jurisdiction. First, plaintiffs provide evidence that NEC has utilized various federal courts to pursue certain legal claims. For example, NEC has filed claims or counterclaims in the Northern District of California, the Southern District of California, and the United States Court of International Trade. *See, e.g., NEC Corporation v. INTEL Corporation,* 654 F.Supp. 1256 (N.D. Cal.1987) (NEC filed declaratory relief action); *NEC Corporation v. United States,* 622 F.Supp. 1086 (Cit.1985), *rehearing denied,* 628 F.Supp. 976 (Cir.1986), *affirmed,* 806 F.2d 247 (Fed.Cir.1986) (NEC filed action to contest federal government's administrative review of anti-dumping finding); *NEC Electronics v. Cal Circuit Abco,* 810 F.2d 1506 (9th Cir.1987) (NEC filed counterclaims in trademark infringement action). Certainly, a foreign defendant "who seeks relief in the United States courts [can] be required to respond to claims for relief against it in those courts." *Meadows, supra,* 599 F.Supp. at 607; *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 630–32, 103 S.Ct. 2591, 2601–03, 77 L.Ed.2d 46 (1983) (foreign state seeking relief in United States court may not assert sovereign immunity defense to counterclaim); *Kyle v. Continental Capital Corp.,* 575 F.Supp. 616, 620 (E.D. Penn.1983) (in addition to other contacts with forum, defendant filed dozens of liens under Pennsylvania law); *In re A & W Publishers, Inc.,* 39 B.R. 666, 667–68 (D.C. N.Y.1984) (British corporate creditor subject to jurisdiction of New York court when, among other contacts, it utilized New York's legal system to enforce confessions of judgment and collect funds). Thus, by availing itself of the federal court system, NEC may be fairly called upon now to answer claims brought in that system.

Second, plaintiffs present uncontroverted evidence that NEC has directly advertised the "NEC" trademark in periodicals which circulate in the United States.[15] Although advertising by itself is not sufficient to confer jurisdiction over the advertiser, it remains one factor to be considered in combination with other forum contacts. *Runnels v. TMSI Contractors, Inc.,* 764 F.2d 417, 421 (5th Cir.1985) (Saudi Arabian partnership had sufficient minimum contacts with Louisiana where, among other contacts, partnership had placed advertisements in two Louisiana newspapers over a five year period); *Wentling, supra,* 176 F.Supp. at 659 (among other activities, defendant in antitrust action "engaged in various advertising and sales promotion campaigns"); *but cf., San Antonio Telephone Company, Inc. v. American Tel. & Tel. Co.,* 499 F.2d 349, 351–52 n. 5 (5th Cir.1974) (national advertising which finds its way into a particular jurisdiction is insufficient to support a finding that defendant transacted business); *Sherman College of Straight Chiropractic v. American Chiropractic Ass'n, Inc.,* 534 F.Supp. 438, 443 (N.D.Ga.1982) (distribution of public service announcements does not by itself constitute "transaction of business").

Third, the record indicates that NEC has traded American Depository Receipts (ADRs) in the United States securities market since at least 1963. As of March 31, 1986, NEC's American Depository Shares were held by 514 individuals in the United States, and represented approximately three percent of NEC's total outstanding Shares. These securities are currently listed with and actively traded in the NASDAQ System.[16]

---

**15.** The district court in *NEC Electronics, Inc. v. Cal Circuit Abco, Inc.,* CV 85–1344–CBM, *reversed on other grounds,* 810 F.2d 1506 (1987), found that NEC placed advertisements in periodicals circulated in the United States for the purpose of promoting the NEC trademark. The Court takes judicial notice of the unpublished proceedings of this case. *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 635, n. 1 (N.C.Ca. 1978), *aff'd,* 645 F.2d 699, *cert. denied,* 454 U.S.

1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981); 9 Wright & Miller, *supra,* Section 2410 at 359 ("the power of a court to take judicial notice of its own records is amply established by a multitude of cases").

**16.** Plaintiffs' evidence of NEC's ADR trading activity is included in Form 20–9 filed with the United States Securities and Exchange Commission on September 30, 1986 entitled "Annual

"The ADR is the most widely used form of trading foreign securities in the United States, and its use has grown significantly since its inception in 1927." Royston, "The Regulation of American Depositary Receipts: Americanization of the International Capital Markets," 10 *N.C. Journal of Intern. Law & Comm. Regulation,* 87 (1985). These securities allow foreign corporations to profitably enter the United States capital markets, and have grown in popularity because of their relative cost savings and safety compared with directly traded foreign securities. *Id.* at 88 n. 4. Foreign corporations who employ ADRs must register with the Securities and Exchange Commission, and are subject to various federal regulations and reporting rules. *Id.* at 90–95.

The Court believes that by registering with, and transacting business under the auspices of, the United States Securities and Exchange Commission, NEC has availed itself of the privileges and protections of the United States and its government. These benefits have been ongoing since the early 1960's, and constitute one form of "systematic and continuous" contact with the United States as a whole. Given the obvious benefits the use of ADRs provide to NEC, and in light of the fact that these securities are actively traded in the United States, and regulated by federal law, the Court believes it is proper to consider the trading of these securities for purposes of establishing personal jurisdiction. More information is needed, how-

ever, on the nature and volume of NEC's trading activity.[17]

Finally, plaintiffs present uncontroverted evidence that the United States Department of Commerce has determined that since the early 1970s, NEC has engaged in "dumping" television sets on the United States market in violation of federal law.[18] At a minimum, this evidence suggests that NEC has, either directly or indirectly, served the electronics markets throughout the United States. Certainly a defendant's "purposeful exploitation of the forum's market" constitutes meaningful contact for jurisdiction purposes. *United States v. Toyota Motor Corp., supra,* 561 F.Supp. at 359 (due process satisfied when Japanese parent corporation knew or should have known that its vehicles would be sold in the United States); *Scott, supra,* 519 F.Supp. at 1125 (foreign defendant whose products were distributed and sold throughout the United States was "clearly doing business" in forum state). Again, although not dispositive of the personal jurisdiction issue, this evidence suggests that NEC has maintained a presence in, and established substantial contacts with, the United States as a whole sufficient to warrant the exercise of personal jurisdiction over this defendant.

In sum, the above uncontroverted facts, taken together, constitute a prima facie showing of personal jurisdiction based on its "national," "aggregate," or "cumulative" contacts with the United States. Accordingly, NEC's motion to dismiss pursu-

Report Pursuant to Section 13a or 15(d) of the Securities Exchange Act of 1934". The Court takes judicial notice of this document. *Communications Satellite Corp. v. F.C.C.,* 611 F.2d 883, 901 n. 31 (D.C.1977) (judicial notice taken of publically filed documents).

**17.** The only reported case which has considered the trading of ADRs as a factor in determining personal jurisdiction held that such transactions did not constitute a meaningful form of contacts with the forum state. *Williams v. Canon,* 432 F.Supp. 376, 379 (C.D.Cal.1977). *Williams,* however, only determined that these securities, *which were traded in New York,* were not relevant to establishing jurisdiction based on contacts with *California. Id.* It did not consider the issue posed in the present motion: i.e., whether or not trading ADRs in the United

States constitutes a legitimate form of contacts with this country as a whole for jurisdiction purposes under the national contacts theory.

**18.** Plaintiff's evidence related to the United States government's determinations that NEC has sold televisions on the American market in violation of the Antidumping Act of 1921, as amended, 19 U.S.C. § 160(a), consists of several findings published in the Federal Register. *See* 36 Fed.Regis. 4597 (March 10, 1971); 48 Fed.Regis. 37596–37509 (August 18, 1983); and 50 Fed. Regis. 24278–24283 (June 10, 1985). The Court takes judicial notice of these findings pursuant to 44 U.S.C. Section 1507. In 1985, NEC initiated litigation in federal court challenging the United States government's administrative findings in this matter. *See NEC Corporation, supra,* 622 F.Supp. at 1087.

ant to Federal Rules of Civil Procedure, Rule 12(b)(2) is DENIED without prejudice.

## IV. SERVICE OF PROCESS

On December 20, 1986, plaintiffs effected mail service of the summons and complaint in this action on NEC and NECHE–Japan respectively in accordance with California Code of Civil Procedure, Section 415.40,[19] made applicable here by Fed.R.Civ.Proc., Rule 4(e).[20] Defendants received these documents at their respective mailing addresses in Japan on December 23, 1986. NEC and NECHE–Japan now challenge the sufficiency of this service on two separate but related grounds.

### A. *Service Under the Hague Convention*

■ Defendants first argue that service of process in Japan was invalid because plaintiffs failed to follow the provisions of The Hague Convention. The Hague Convention is a multinational treaty entered into by Japan in 1970. Fijita, "Service of Process Upon Japanese Nationals By Registered Airmail and Enforceability of Resulting American Judgment in Japan," 12 *Law in Japan* 69, 70 n. 3 (1979). The United States became a signatory in 1972. 20 U.S.T. 361, T.I.A.S. 6338, *reprinted in* 28 U.S.C.A. Fed.R.Civ.Proc., 4 (West Supp. 1987), pp. 104–108. Article Ten of the Convention states in relevant part:

"Provided the State of destination does not object, the present Convention shall not interfere with—

(a) the freedom to send judicial documents, by postal channels, directly to persons abroad, .... (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination, (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Fed.R.Civ.Proc. 4 (West Supp.1987), at 105. In its formal acceptance of The Hague Convention, the Japanese government objected to subparagraphs (b) and (c) of Article 10, but did not object to subsection (a). Fed.R.Civ.Proc., Rule 4 (West Supp.1987), at 114.

Courts differ on the meaning and significance of Japan's decision not to object to Article 10(a). Some courts have held that Japan's failure to object indicates the country's acceptance of service of process by mail. *See, e.g., Ackermann v. Levine,* 788 F.2d 830, 839–40 (2nd Cir.1986); *Lemme v. Wine of Japan Import, Inc.,* 631 F.Supp. 456, 463 (E.D.N.Y.1986); *Weight v. Kawasaki Heavy Indus., Ltd.,* 597 F.Supp. 1082, 1085–86 (E.D.Va.1984); *Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182, 1206 (D.D.C.1984); *Shoei Kako Co. v. Superior Court,* 33 Cal.App.3d 808, 822, 109 Cal.Rptr. 402 (1973). These courts reason that since the purported purpose of the Convention is to facilitate service abroad, the reference to " 'the freedom to send judicial documents by postal channels, directly to persons abroad' would be superfluous unless it was related to the sending of such documents for the purpose of service." *Id.* at 821; *Ackerman, supra* at 839; *Lemme, supra* at 463.

Other courts have adopted the view that Japan's failure to object to Article 10(a) of the Convention does not amount to accept-

---

**19.** California Code of Civil Procedure § 415.40 provides in relevant part:

A summons may be served on a person outside this state in any manner provided by this article or by sending a copy of the summons and of the complaint to the person to be served by first-class mail, postage prepaid, requiring a return receipt.

**20.** Rule 4(e) of the Federal Rules of Civil Procedures provides in relevant part:

"Whenever a statute or rule of court of a state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule."

ance of mail service. *See, e.g., Pochop v. Toyota Motor Co.,* 111 F.R.D. 464 (S.D. Miss.1986); *Mommsen v. Toro Co.,* 108 F.R.D. 444 (S.D.Iowa 1985); *Rissew v. Yamaha Motor Co., Ltd.,* 129 Misc.2d 317, 493 N.Y.S.2d 78, 80–81 (1985). These courts argue that if the drafters of Article 10(a) had intended this section to provide an additional means of effective service of process, they would have specified "service of process" rather than permitting parties merely to "send" judicial documents through the mail. *Pochop, supra* at 466; *Mommsen, supra* at 446; *Rissew, supra* at 81.

This Court finds the reasoning in *Ackerman, Lemme, Weight, Chrysler Corp.,* and *Shoei* persuasive. Particularly persuasive is the following passage from *Shoei:*

"If it be assumed that the purpose of the convention is to establish one method to avoid the difficulties and controversy attendant to the use of other methods ..., it does not necessarily follow that other methods may not be used *if effective proof of delivery can be made.*"

*Shoei, supra,* 33 Cal.App.3d at 821, 109 Cal.Rptr. 402 (citations omitted; emphasis added). Here, proof of delivery was assured under the provisions of California Code of Civil Procedure § 415.40 when plaintiffs received return receipts evidencing that the summonses and complaints were received by NEC and NECHE–USA repectively on December 23, 1986.

Moreover, the Court notes that this interpretation of The Hague Convention is consistent with the Ninth Circuit's views on the interface between the Convention and the Federal Rules of Civil Procedure in the discovery context. In *Societe Nationale Industrille Aerospatiale v. United States District Court,* 788 F.2d 1408 (9th Cir. 1986), the court upheld a lower court decision not to require that discovery involving a French government-owned corporation be undertaken in accordance with the provi-

sions of The Hague Convention. In explaining its decision the court stated:

"The Hague Convention was intended ... not only to protect foreign nationals from American discovery procedures, but also to make more evidence accessible to Common Law litigants through the cooperation and coercive powers of foreign authorities.

*The Convention was not intended to shield foreign litigants from the normal burdens of litigation in American courts. If the Hague Convention supplanted the Federal Rules of Civil Procedure, foreign litigants would have an extraordinary advantage in American courts.*"

*Id.* at 1411 (citations and footnotes omitted; emphasis added); *accord In re Societe Nationale Industrielle Aerospatiale,* 782 F.2d 120, 123–25 (8th Cir.1986). The *Societe Nationale* court directed "that resort to the convention should be considered in each case," but need not "be utilized first in every case." *Societe Nationale, supra,* 288 F.2d at 1411. Furthermore, the court identified the degree of intrusion on the foreign sovereign as a major factor to be considered. *Id.*

In the present action, defendants have not demonstrated how direct mail service of process on NEC and NECHE–Japan represents an intrusion on Japanese sovereignty. Thus, in light of *Societe Nationale,* and for the reasons stated above, the Court finds that mail service on defendants NEC and NECHE–Japan in accordance with Code of Civil Procedure § 415.40 was proper.

**B.** *Timeliness of Service*

NEC and NECHE–Japan next claim they are entitled to an order dismissing them from this action because service of process on them was not effected within 120 days of the date the complaint was filed as required by Rule 4(j) of the Federal Rules of Civil Procedure.[21] Plaintiffs filed

---

**21.** Rule 4(j) of the Federal Rules of Procedure provides in relevant part:

 "*Summons: Time Limit for Service*

If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required

their complaint in this case August 27, 1986, but pursuant to an order staying further action, did not mail the summons and complaint to NEC and NECHE–Japan until December 20, 1986. The documents were received in Japan three days later.[22] NEC and NECHE–Japan argue that under Code of Civil Procedure § 415.40, plaintiffs' service of process was not effective until December 30, 1986, ten days after the summonses and complaints were postmarked and 125 days after plaintiffs filed their complaint.

Section 415.40 states:

"A summons may be served on a person outside this state in any manner provided by this article or by sending a copy of the summons and of the complaint to the person to be served by first class mail, postage prepaid, requiring a return receipt. *Service of a summons by this form of mail is deemed complete on the 10th day after such mailing.*"

West California Codes 1973 and Supp.1987 (emphasis added). In *Johnson & Johnson v. Superior Court,* 38 Cal.3d 243, 211 Cal. Rptr. 517, 695 P.2d 1058 (1985), the California Supreme Court held that for purposes of determining the timeliness of service, *the date of mailing,* not the tenth day following mailing, controls. The *Johnson & Johnson* Court reasoned as follows:

"Clearly, when the Legislature intends that service is not to be effective until the date of actual receipt, it knows how

to say so. In section 415.40, it chose instead to make the date of mailing determinative."

*Id.* at 250, 211 Cal.Rptr. 517, 695 P.2d 1058.

Here, the date of mailing was December 20, 1986. This date was within the 120–day period provided for in F.R.C.P. 4(j) Accordingly, the Court finds that plaintiffs timely served their summons and complaint on NEC and NECHE–Japan respectively.

## V. PLAINTIFFS' FEDERAL ANTITRUST CLAIMS

### A. *Section 1 of the Sherman Antitrust Act—First Cause of Action*

Plaintiffs' first cause of action alleges three separate but related conspiracies to restrain trade in violation of Section 1 of the Sherman Antitrust Act.[23] First, plaintiffs aver that NEC, NECHE–Japan, and NECHE–USA conspired among themselves to unlawfully fix prices and restrain trade. Complaint, ¶ 23. Second, they allege that defendants conspired with "certain other entities and individuals" to violate § 1, including, but not limited to, "certain of the authorized distributors and representatives of NECHE–USA and certain authorized distributors and representatives of NEC and NECHE–Japan located in Japan and other overseas locations." *Id.* Finally, plaintiffs claim that NCI participated with the defendants as an involuntary co-conspirator when, for a period of time, NCI

cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own intiative with notice to such party or upon motion ...

22. On the day plaintiffs filed this action, the Court granted their application for a Temporary Restraining Order. On September 8, 1986, the Court stayed all proceedings in this action except for limited discovery pending arbitration of the termination issue. Properly, plaintiffs concluded that under the Court's order they were precluded from initiating service of process on NEC and NECHE–Japan. Then, on December 1, 1986, pursuant to plaintiff's request for clarification, the Court amended its September 8, 1986, order to specifically allow service of process on the named defendants. On December 20, 1986, plaintiffs mailed the summons and complaint separately to NEC and NECHE–Japan. The return receipts indicate that NEC and

NECHE–Japan each received these documents on December 23, 1986.

23. 15 U.S.C. § 1 provides:
*Trusts, etc., in restraint of trade illegal; penalty*
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

allegedly complied with NECHE–USA's instructions not to transact business with a low-pricing retailer. *Id.* at ¶ 25(c).

Defendants move to dismiss the entire claim on the ground it fails as a matter of law to state a claim upon which relief can be granted. For purposes of this motion, the Court will consider each alleged conspiracy in turn.

### (1) *Conspiracy Among NEC, NECHE–Japan, and NECHE–USA*

 Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or foreign nations...." 15 U.S.C. § 1 (West 1973 Supp.1986). The elements of a § 1 violation are: "(1) an agreement or conspiracy, (2) resulting in an unreasonable restraint of trade (3) causing 'anti-trust' injury." *Rickards v. Canine Eye Registration Foundation, Inc.,* 783 F.2d 1329, 1332 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 180, 92 L.Ed.2d 115 (1986).

In *Copperweld Corp. v. Independence Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation and its wholly-owned subsidiary cannot, as a matter of law, conspire with each other for purposes of § 1 of the Sherman Act. *Id.* at 2745.[24] The *Copperweld* Court explained why "agreements" between a parent and its wholly-owned subsidiary do not present the threat of anti-competitive effects that § 1 of the Sherman Act was adopted to address:

> "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of Section 1 of the Sherman

Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for Section 1 scrutiny.... Indeed, the very notion of an agreement in Sherman Act terms between a parent and wholly owned subsidiary lacks meaning [because] ... in reality, a parent and wholly owned subsidiary *always* have a 'unity of purpose' or '[the] common design' [required to establish a conspiracy to violate Section 1]."

*Copperweld,* 467 U.S. at 771, 104 S.Ct. at 2741–42 (emphasis original). The Supreme Court added that "the purposeful choice of a parent corporation to organize a sub-unit as a subsidiary is not itself a reason to heighten antitrust scrutiny, because it is not laden with anti-competitive risk." *Id.* at 772 n. 19, 104 S.Ct. at 2742 n. 19.

In the present action, NECHE–Japan and NECHE–USA are wholly-owned subsidiaries of NEC. Applying *Copperweld,* these three corporate entities must be viewed as a "single entity" with a complete "unity of interest" for purposes of § 1 of the Sherman Act. *Id.* at 771, 104 S.Ct. at 2742. Accordingly, plaintiffs' allegations of conspiracy among NEC, NECHE–Japan, and NECHE–USA to restrain trade under § 1 must be dismissed with prejudice.[25]

---

**24.** This holding has been uniformly followed in this and other Circuits. *See e.g., Lake Communications, Inc. v. ICC Corp.,* 738 F.2d 1473, 1480 (9th Cir.1984); *Tunis Brothers Co. v. Ford Motor Co.,* 763 F.2d 1482, n. 20 (3rd Cir.1985), *vacated on other grounds,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986); *Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984); *Bryant Heating and Air Conditioning Corp. v. Carrier Corp.,* 597 F.Supp. 1045, 1048 (S.D.Fla. 1984).

**25.** Plaintiffs argue that *Copperweld* should be limited to its facts. In that case, all alleged co-conspirators except a single parent corporation and its wholly-owned subsidiary were exonerated of alleged antitrust activity following a jury trial. *Id.* at 757–58, 104 S.Ct. at 2734–35. Plaintiffs reason that *Copperweld* does not apply where, as in the present case, two "sister subsidiaries" are involved in the alleged conspiracy in addition to the parent corporation. For this proposition, plaintiffs cite *Ray Dobbins Lincoln*

**(2)** *Defendants' Alleged Conspiracy with "Other Entities and Individuals"*

 Plaintiffs next allege that defendants combined or conspired with "other entities and individuals," including, but not limited to both foreign and domestic authorized distributors or representatives of NEC and NECHE–USA. Complaint, ¶ 23. Defendants argue this language is merely conclusory and insufficient to place defendants on notice of plaintiffs' claims.

In the Ninth Circuit, "antitrust pleadings need not contain great factual specificity." *Portland Retail, Etc. v. Kaiser Foundation, Etc.*, 662 F.2d 641, 648 (9th Cir.1981), *cert. denied*, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 368 (1981); *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th. Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1980). Indeed, "[t]here is no special rule requiring more factual specificity in antitrust pleadings." *Id.; Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir.1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). However, it is axiomatic that a complaint must contain allegations sufficient to place the defendants on notice of the facts underlying the plaintiff's claims. *Lombard's Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986); *see also* Fed.R.Civ. Proc., Rule 8(a).

To date two courts have directly addressed the issue of whether pleading the participation of unidentified co-conspirators satisfies the requirements of notice pleading in light of *Copperweld*. In *Sadler v. Rexair, Inc.*, 612 F.Supp. 491 (D.C.Mont. 1985), the plaintiff alleged that the defendants, a parent corporation and its wholly owned subsidiary, conspired with "other debtors" to violate § 1 of the Sherman Act. *Id.* at 494. The court held that "plaintiff [cannot] salvage its complaint [from *Copperweld*] by adding unidentified participates, i.e., 'other debtors.' Such pleading is inadequate to give the defendants fair notice of plaintiff's claim." *Id., citing Lombard's, Inc. v. Prince MFG, Inc.*, 753 F.2d 974, 975 (11th Cir.) *cert. denied*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1985) ("A conclusory allegation of conspiracy to restrain trade will not survive a motion to dismiss"). Similarly, in *Garshman v. Universal Resources Holding, Inc.*, 641 F.Supp. 1359 (D.C.N.J.1986), a defendant cross-complained against a pipeline company, its parent, a public utility holding company, and unidentified "other entities" for violation of § 1. *Id.* at 1370. In dismissing the cross-claims, the court held that the allegation as to "other entities" was "too vague to stand." *Id., citing Kalmanoivitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385, 1400 (D.Del.1984) (in an antitrust action, a "mere general allegation of conspiracy is insufficient").

In the instant action, plaintiffs have done more than simply allege a conspiracy with "other entities." They have instead identified these entities as certain authorized foreign and domestic distributors of defendants' products. However, plaintiffs' allega-

*Mercury, Inc. v. Ford Motor Co.*, 604 F.Supp. 203 (W.D.Va.1984).
This Court finds that the facts of the present action are analogous to *Copperweld* and easily distinguishable from those in *Ray Dobbins*. In *Ray Dobbins*, plaintiffs brought a state law antitrust action against the Ford Motor Company and two of its wholly owned subsidiaries. *Id.* at 204. After the district Court had dismissed Ford Motor Company from the action, the two subsidiaries moved for dismissal based on the reasoning in *Copperweld*. Judge Turk denied the motion, concluding that:
"Defendants' reliance on *Copperweld* is ill-placed ... as to any allegation of conspiracy between the two subsidiaries. Such a con-

spiracy in no way implicates the rejected intra-enterprise conspiracy doctrine, *which applies only where the parent is an alleged co-conspirator.*"
*Id.* at 205 (emphasis added). Unlike the situation in *Ray Dobbins*, the parent corporation here, NEC, remains an "alleged co-conspirator" in the case and, according to plaintiffs' complaint, actually directed the conspiracy in which its subsidiaries allegedly participated. Indeed, plaintiffs make no allegations that NECHE–Japan and NECHE–USA engaged in any conspiratorial conduct apart from the activity involving NEC. Accordingly, the Court finds plaintiffs' argument to be without merit.

tions are still insufficient to place defendants on notice of a valid § 1 claim for two reasons. First, NEC and NECHE–Japan have numerous distributors throughout the United States. Without identifying which of these distributors allegedly conspired with NEC and NECHE–Japan to control prices, defendants have not been placed on notice as to the identity of their alleged co-conspirators. *Id.* at 1370 ("Merely adding unidentified participants ... does not provide defendants with adequate notice of [plaintiff's] conspiracy claim"). Second, all the alleged wrongful acts contained in plaintiffs' first cause of action involve actions taken solely by NEC, NECHE–Japan, and NECHE–USA. *See, e.g.,* Complaint, ¶ 25. Nowhere in their complaint do plaintiffs allege specific wrongful acts by any of defendants' authorized distributors. In an antitrust complaint, the "mere allegation of a legal conclusion is inadequate of itself to state a cause of action." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273–74 (5th Cir.1979). Thus, "[t]he pleader must allege the facts constituting the conspiracy, its object and accomplishment." *Id.* at 273. At this stage in the litigation (over eight months after the complaint was filed) plaintiffs should be able to identify with specificity any co-conspirators if they exist, and plead what wrongful acts these entities allegedly undertook. Plaintiffs' allegations as to this conspiracy must therefore be dismissed. This ruling is without prejudice and with twenty days leave to amend.

### (3) *Plaintiff's Claim of "Involuntary" Conspiracy*

Finally, plaintiffs contend their Section 1 claim survives *Copperweld* because their complaint identifies NCI as an "involuntary co-conspirator" in defendants' alleged antitrust conspiracy. Specifically, they refer to ¶ 25(c) of the complaint, which states: "In or about May of 1986, NECHE–USA instructed NCI to refuse to deal with a low-pricing retailer." Although their argument is not clear, plaintiffs apparently rely on the line of cases which hold that a manufacturer may form a "conspiracy" or

"combination" under § 1 if it imposes restraints on distributors by coercive conduct, and the distributors involuntarily adhere to those restraints. *See Albrecht v. Herald Co.,* 390 U.S. 145, 149–50, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *United States v. Parke Davis & Co.,* 362 U.S. 29, 44–45, 80 S.Ct. 503, 511–12, 4 L.Ed.2d 505 (1960); *G.H.I.I. v. MTS, Inc.,* 147 Cal. App.3d 256, 268, 195 Cal.Rptr. 211 (1983).

The problem with plaintiffs' argument is two-fold. First, their complaint cannot be fairly read as alleging that NCI ever assented to or participated in the alleged price-fixing conspiracy. To the contrary, ¶ 25(e) of the complaint states that NCI's distributorship was terminated as an "example to other distributors of the consequences to anyone who sold at prices not pleasing to NEC, NECHE–Japan, and NECHE–USA." This allegation suggests that NCI was targeted precisely because it would *not* participate in the conspiracy.

Second, the continuing validity of *Albrecht* and its progeny has been cast in some doubt by the Supreme Court's decision in *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764 n. 9, 104 S.Ct. 1464, 1471 n. 9, 79 L.Ed.2d 775 (1984), wherein the Supreme Court stated that a terminated distributor must present evidence "both that the distributor communicated its acquiescence or agreement [in the alleged price-fixing scheme], and that this was sought by the manufacturer." *See also Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir.1986). Here, plaintiffs fail to allege that NCI ever communicated its acquiescence in or agreement with the alleged conspiracy involving NEC, NECHE–Japan, and NECHE–USA.

For these reasons, the Court finds that plaintiffs have not adequately alleged an involuntary conspiracy among NCI and defendants to restrain trade under Section 1 of the Sherman Act. Accordingly, the Court dismisses plaintiffs' allegations in ¶ 25(c) of the complaint. This dismissal is without prejudice and with twenty days leave to amend.

**B.** *The Wilson Tariff Act—Fourth Cause of Action*

Plaintiffs' fourth cause of action alleges violation of § 73 of the Wilson Tariff Act.[26] Defendants urge the Court to apply *Copperweld* to the Wilson Act by analogy and dismiss this claim pursuant to Fed.R.Civ.Proc. 12(b)(6) for failure to state a claim under which relief can be granted.

As the Ninth Circuit and several other courts have noted, the language of, and proscribed conduct included within, the Wilson Act is analogous to § 1 of the Sherman Act. *Western Concrete Structures Co. v. Mitsui & Co.*, 760 F.2d 1013, 1018–19 (9th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Timerlane Lumber Co. v. Bank of America N.T. & S.A.*, 549 F.2d 597, 600 n. 1 (9th Cir.1976); *Zenith Radio Corp. v. Matsushita Electric Industries, Co.*, 513 F.Supp. 1100, 1164–65 (E.D.Pa.1981), *aff'd in part, rev'd in part*, 723 F.2d 238 (3rd Cir.1983). Indeed, the common language of both statutes *specifically prohibits* conspiracies to engage in certain unlawful conduct. *Western Concrete, supra* at 1018–19. Accordingly, the Court finds that *Copperweld's* reasoning applies to violations of the Wilson Tariff Act as well as to violations of § 1 of the Sherman Act, and, for the reasons stated in § V(A) of this opinion, dismisses plaintiffs' fourth cause of action without prejudice and with twenty days leave to amend.

**C.** *Section 2 of the Sherman Act— Third Cause of Action*

Plaintiffs' third cause of action alleges that NEC and NECHE–Japan violated § 2 of the Sherman Antitrust Act by monopolizing or attempting to monopolize the market for "self-synchronizing high resolution color monitors." Complaint, ¶¶ 28–29. Section 2 of the Sherman Act provides, in relevant part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony."[27] To establish liability for "monopolization," plaintiffs must plead and prove: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; [and] (3) a resulting antitrust injury." *Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1382 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Defendants move to dismiss this claim on the ground that plaintiffs have failed to adequately allege either the "relevant market" or the "willful acquisition or maintenance of a monopoly in that market." They do not, on the present motion, challenge plaintiffs' allegations related to antitrust injury.

---

**26.** 15 U.S.C. § 8 provides:

*Trusts in restraint of import trade illegal; penalty*

"Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter. Every person who shall be engaged in the importation of goods or any commodity from any foreign country in violation of this section, or who shall combine or conspire with another to violate the same, is guilty of a misdemeanor, and on conviction thereof in any court of the United States such person shall be fined a sum not less than $100 and not exceeding $5,000, and shall be further punished by imprisonment, in the discretion of the court, for a term not less than three months nor exceeding twelve months.

**27.** 15 U.S.C. § 2 provides:

*Monopolizing a trade a felony; penalty*

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars, if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

*(1) Relevant Market.*

██] The relevant market consists of two components: (1) the product market; and (2) the geographic market. *Los Angeles Memorial Coliseum Com'n v. N.F.L.*, 726 F.2d 1381, 1392 (9th Cir.1984), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). Here, defendants challenge only plaintiffs' definition of the product market.

> Defining the product market involves the "process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market."

*Id.*, quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). *See generally* 3 J. Von Kalinowski, *Antitrust Laws and Trade Regulations*, Section 8.02[2][a], p. 8–16.

The Supreme Court has articulated two separate, but related, tests for determining the relevant product market: the "reasonable interchangeability of use" test, and the "cross-elasticity of demand" test. *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir.1986); *Los Angeles Memorial Coliseum, supra,* 726 F.2d at 1393; 3 Von Kalinowski, *supra,* § 8.02[2][a], p. 8–18.

> " 'If the challenged product and its substitutes are reasonably interchangeable by consumers for the same purposes, or if they have a high cross-elasticity of demand in the trade, they will be included in the same market for the purposes of determining the existence of monopoly power....' Reasonable interchangeability emphasizes the economic factors of use and physical characteristics, while cross-elasticity stresses price."

*M.A.P. Oil Co., Inc. v. Texaco, Inc.*, 691 F.2d 1303, 1306, *quoting,* Von Kalinowski, *supra* at 8–18.

██] Furthermore, within a given relevant market, some courts have recognized sub-markets under certain circumstances. *See, e.g., ITT Corp. v. GTE Corp.*, 518 F.2d 913 (9th Cir.1975), *aff'g in part, reversing in part and remanding* 351 F.Supp. 1153 (1972); *Case–Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449 (9th Cir.1966), *cert. denied*, 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994 (1967); *see also* Von Kalinowski, *supra* at 8–26. In determining whether a valid sub-market exists, a court must examine such factors as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *M.A.P. Oil Co., supra,* 691 F.2d at 1306.

Here, plaintiffs allege that the relevant market consists of all high resolution color monitors, and the relevant sub-market of all "self-synchronizing high resolution color monitors." Complaint, ¶¶ 10 and 39. Plaintiffs further allege that defendants, through the MultiSync monitor, control one-hundred percent of this sub-market. *Id.* at 18. According to plaintiffs, the MultiSync has two characteristics which justify its designation as a sub-market. First, the monitor is unique because of its "self-synchronizing" feature which allows it to automatically adjust to what are known in the computer industry as "color board scanning frequencies." Thus, plaintiffs claim, "the MultiSync is usable with virtually all boards currently in existence and, significantly as well, is likely to be usable with all color boards which may come into existence." Complaint, ¶ 16. Second, MultiSync is priced significantly below other high resolution color monitors (i.e., $799 per unit compared to a market price of $1,500 to $2,000 per unit). Complaint, ¶ 15. This feature, plaintiffs point out, is one of this product's most important assets.

The above allegations do not sufficiently plead a relevant sub-market in this action. Importantly, plaintiffs have not alleged any of the other factors necessary to justify a sub-market designation, such as industry or public recognition of the MultiSync as an economic entity separate from other high resolution color monitors, unique production facilities, distinct customers, sensitivity to price changes, or specialized vendors for the machine. Given that the specification of sub-markets limited to a defendant's own product is not commonly undertaken in antitrust actions, *see Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1379–80 (9th Cir.1981) (rejecting argument that Fiats in particular, rather than cars in general, constitute the relevant market); the Court finds that plaintiffs have not pleaded sufficient facts defining the relevant sub-market in this action.

### (2) *Willful Acquisition or Maintenance of a Monopoly in the Relevant Market*

■ The second element of a successful § 2 claim requires plaintiffs to plead and prove that defendants have "engaged in 'willful' acts directed at establishing or maintaining its monopoly, 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *California Computer Products v. Intern. Business Machines,* 613 F.2d 727, 735 (9th Cir.1979), *quoting United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Plaintiffs need not demonstrate that the defendants' alleged acts were unlawful, but only that they " 'unnecessarily excluded competition' from the relevant market." *California Computer Products, supra* at 735, *quoting Greyhound Computer Corp. v. IBM,* 559 F.2d 488, 498 (9th Cir.1977). In the Ninth Circuit, "the test is whether the defendant's acts, otherwise lawful, were *unrea-*

*sonably* restrictive of competition." *Id.* at 735–36 (emphasis added), *citing Gough v. Rossmoor Corp.,* 487 F.2d 373, 376 (9th Cir.1973).

Here, plaintiffs allege that defendants engaged in the following activities which they claim unreasonably restricted competition:

(1) Defendants refused to deal with distributors who sold the MultiSync monitors below a certain price. Complaint, ¶ 25(a);

(2) Defendant NEC, acting by and through NECHE–Japan, instructed NECHE–USA to terminate distributors who sold below a certain price. *Id.* at 25(b);

(3) Defendant NECHE–USA instructed plaintiffs not to deal with low-pricing retailers, including plaintiff Logic Array. *Id.* at 25(c) and (d); and

(4) Defendant NECHE–USA, with the knowing assistance and approval of NECHE–Japan and NEC, terminated its distributorship agreement with plaintiff NCI. *Id.* at 25(e).

The Court must accept these alleged acts as true for purposes of the present motion to dismiss. *Ginn v. Mathews,* 533 F.2d 477, 478 (9th Cir.1976). Although plaintiffs still must prove these allegations at trial, these allegations are sufficient for purposes of a Rule 12(b)(6) motion to dismiss.

In sum, since plaintiffs have not sufficiently pleaded all elements of a § 2 claim, the Court grants defendants' motion to dismiss the third cause of action without prejudice and with twenty days leave to amend.

## VI. PLAINTIFFS' STATE ANTITRUST CLAIM—FIFTH CAUSE OF ACTION

■ Plaintiffs' fifth cause of action alleges violation of the Cartwright Act, California's version of the Sherman Antitrust Act. *See* California Business and Professions Code §§ 16600, *et seq.*[28] In light of

---

**28.** Plaintiffs have standing to sue under the Cartwright Act pursuant to C.C.P. § 16750, which provides in relevant part:

*Civil action; venue; damages; attorney fee; costs*

"(a) Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction in the country where the defend-

this Court's ruling with respect to plaintiff's first claim for violation of § 1 of the Sherman Act, the issue raised here is whether a similar ruling is warranted on the analogous state antitrust claim. No reported California appellate decision has yet considered the impact of *Copperweld* on the Cartwright Act. Accordingly, this Court must decide this issue as it believes the California Supreme Court would determine it in light of all relevant state authority. *In re Related Asbestos Cases,* 578 F.Supp. 91, 93 (N.D.Cal.1983); 19 Wright & Miller, *supra,* Section 4507 at 89; *see also Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).

California courts have consistently recognized that "the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." *Marin County Board of Realtors v. Great Western Financial Corp.,* 16 Cal.3d 920, 130 Cal.Rptr. 1, 549 P.2d 833 (1976) (and cases cited therein); *Chicago Title Ins. Co. v. Great Western Financial Corp.,* 69 Cal.2d 305, 315, 70 Cal.Rptr. 849, 444 P.2d 481 (1968); *La Fortune v. Ebie,* 26 Cal.App.3d 72, 74–75, 102 Cal.Rptr. 588 (1972). Thus, California case law suggests that *Copper-*

*weld* will be persuasive authority in interpreting the Cartwright Act. Moreover, the Ninth Circuit is apparently convinced the California Supreme Court will apply *Copperweld* by analogy to its own antitrust laws. In *Lake Communications, supra,* 738 F.2d at 1480, the court stated that "[*Copperweld*] is not dispositive of [plaintiff's] antitrust claims under the state law, but it is likely to be persuasive to the Supreme Court of California in interpreting state antitrust statutes."

Given the California policy of applying federal cases to the Cartwright Act, and the Ninth Circuit's views on how the California Supreme Court is likely to rule, this Court will apply *Copperweld* by analogy and, for the reasons discussed above in § V(A), of this opinion, dismiss plaintiffs' fifth cause of action without prejudice and with twenty days leave to amend.[29]

## VII. PLAINTIFFS' CAUSE OF ACTION FOR UNFAIR COMPETITION— SIXTH CAUSE OF ACTION

■ Finally, plaintiffs' sixth cause of action seeks compensatory and punitive damages against defendants for unfair competition under California law. Unfair business practices in California are regulated by Chapter 4 of the California Business and Professions Code §§ 17000 *et seq.*

---

ant resides or is found, or any agent resides or is found, or where service may be obtained, without respect to the amount in controversy, and to recover three times the damages sustained by him or her, interest on his or her actual damages pursuant to Section 16761, and shall be awarded a reasonable attorneys' fee together with the costs of the suit.

Such action may be brought by any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant."

**29.** Plaintiffs rely on *Louisiana Power & Light Co. v. United Gas Co.,* 493 So.2d 1149 (1986). In *Louisiana Power & Light,* the Louisiana Supreme Court interpreted that state's antitrust laws in light of *Copperweld,* duly noting that *Copperweld* "should be persuasive influence on the interpretation of our own state enactment." *Id.* at 1158. Notwithstanding this self-admon-

ishment, however, the Louisiana high court held that:

"Louisiana's prohibition against contracts, combinations and conspiracies in restraint of trade does not except from its provisions unreasonable restraints of trade committed by a parent corporation and its partially or wholly owned subsidiary corporation. In so holding we affirm this Court's earlier decision in *Tooke & Reynolds v. Bastrop Ice & Storage Co., Inc.,* [172 La. 781, 135 So. 239 (1931)] and so interpret [the state's antitrust law] unpersuaded by the United States Supreme Court's recent interpretation of its counterpart anti-trust statute in *Copperweld." Id.* at 1160. *Louisiana Power & Light* is not persuasive. The court in that case based its decision on established state caselaw which adopted a position contrary to that taken in *Copperweld.* Plaintiffs here do not cite, and this Court could not find, any comparable precedent in California law which would undermine the persuasive value of *Copperweld* in the present action.

Complaint, ¶¶ 45–50. Defendants contend that California Business and Professions Code § 17203, which sets forth the types of relief available for successful unfair competition claims, precludes plaintiffs' claim for compensatory damages.[30]

Section 17203 provides for the following remedies for violations of this Chapter:

"[a]ny person performing or proposing to perform an act of unfair competition within this state may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments ... as may be necessary to prevent the use or employment ... of any practice which constitutes unfair competition ... or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

Although the California courts have not considered the scope of remedies available under § 17203, they have reviewed the range of relief provided under substantially similar language found in California Business & Professions Code § 17535.[31] *Fletcher v. Security Pacific National Bank*, 23 Cal.3d 442, 452, 153 Cal.Rptr. 28, 591 P.2d 51 (1979); *People v. Superior Court (Jayhill Corp.)*, 9 Cal.3d 283, 107 Cal.Rptr. 192, 507 P.2d 1400 (1973).

In *Fletcher*, the California Supreme Court held that monetary relief in the form of restitution may be awarded under the broad remedial measures available to a court in unfair competition claims:

"the basic equitable principles underlying section 17535 arm the trial court with broad discretionary power to order restitutionary relief.... A court of equity may exercise its full range of powers 'in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved.' As we stated recently, 'Even in the absence of the specific authorization contained in section 17535, *a trial court has the inherent power to order restitution as a form of ancillary relief* ....' "

*Fletcher, supra,* 23 Cal.3d at 452, 153 Cal. Rptr. 28, 591 P.2d 51 (emphasis added; citations omitted); *see also Meta–Film Associates, Inc. v. MCA, Inc.,* 586 F.Supp. 1346, 1363 (C.D.Cal.1984) ("In certain circumstances, courts may award monetary relief in statutory unfair competition actions.")

Applying *Fletcher* by analogy, the Court finds that plaintiff's sixth cause of action states a valid claim under Business & Professions Code § 17203 for equitable relief including restitution for unfair competitive acts. Thus, defendants' motion as to these claims is denied. However, because plaintiffs are limited to equitable relief including restitution, their claims for compensatory or punitive damages must be dismissed with prejudice.[32]

---

**30.** California Business & Professions Code § 17203 provides:

Injunction;

"Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

**31.** California Business and Professions Code § 17535, provides in relevant part:

Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, ... as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.

**32.** Plaintiffs rely on *United Farm Workers of America v. Superior Court,* 47 Cal.App.3d 334, 120 Cal.Rptr. 904 (1975). In *United Farm Workers,* the California Court of Appeals considered the range of relief available under Section 17535 and noted that even though this statute "sound[s] in equity," a successful plaintiff may still recover "damages if damages can be

## VIII. CONCLUSION

For the reasons stated above, the Court GRANTS defendants' motion to dismiss in part and DENIES it in part. Where indicated in this opinion, plaintiffs shall have twenty days leave to amend their complaint.

shown." *Id.* at 344, 120 Cal.Rptr. 904, *citing People v. Superior Court (Jayhill Corp.),* 9 Cal.3d 283, 107 Cal.Rptr. 192, 507 P.2d 1400 (1973). Although the *Fletcher* Court affirmatively cited *United Farm Workers,* a fair reading of the Court's opinion reveals the Justices' intention to limit "monetary relief" to restitution instead of damages. Moreover, this reading of *Fletcher* is consistent with the interpretation given Section 17535 by the other courts. *See, e.g. Chern v.*

*Bank of America,* 15 Cal.3d 866, 875, 127 Cal. Rptr. 110, 544 P.2d 1310 (1976) ("the applicable [state unfair competition] statutes do not authorize recovery of damages by private individuals"); *Kates v. Crocker National Bank,* 776 F.2d 1396, 1398 (9th Cir.1985) ("California law does not recognize the recovery of damages by individuals for unfair business practices"); *Meta– Film, supra,* 586 F.Supp. at 1363 (monetary relief limited to restitution).